EXCELSIOR INSURANCE COMPANY OF NEW YORK, Respondent, *v.* STATE OF NEW YORK, Appellant.   (Claim No. 25112.)

LIVERPOOL AND LONDON AND GLOBE INSURANCE COMPANY OF LIVER-POOL, ENGLAND, Respondent, *v.* STATE OF NEW YORK, Appellant. (Claim No. 25113.)

ANTHONY L. WATHLEY, Respondent, *v.* STATE OF NEW YORK, Appellant.   (Claim No. 25114.)

Argued January 10, 1946; reargued June 4, 1946, and October 15, 1946; decided October 17, 1946.

41

*Nathaniel L. Goldstein, Attorney-General (Orrin G. Judd, Wendell P. Brown, Edward L. Ryan* and *John R. Davison* of counsel), for appellant. I. Claimants failed to show a breach of duty owed to them by the State. Flood's history did not impose upon the State the duty of keeping him imprisoned. (Pollock's Law of Torts, 150, 151; Restatement, Torts, §§ 316, 319; Amer. Jur. § 61, p. 697; *Steinberg* v. *Cauchois,* 249 App. Div. 518; *Whitside* v. *Wheeler,* 158 Ky. 121; *Thibodeau* v. *Cheff,* 24 Ont. Law Rep. 214; *Calabria* v. *State,* 176 Misc. 925, 263 App. Div. 1056, 289 N. Y. 613; *Halverson* v. *562 W. 149th St. Corp.,* 290 N. Y. 40; *Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339.) II. The State did not assume the duty of keeping Flood constantly confined. (*Hosmer* v. *Carney,* 228 N. Y. 73; *Sporza* v. *German Savings Bank,* 192 N. Y. 8.) III. The finding of the Appellate Division is contrary to the weight of evidence. (*Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339.) IV. There was nothing in the history of Flood prior to the acts complained of, known

to the officers and employees of the Wassaic State School, which placed them on notice that unless kept under constant guard he would elope and would damage the property of another. V. In undertaking to care for and train Flood as a mental defective the State did not assume the duty of keeping him under constant surveillance or behind locked doors and barred windows. (*Calabria* v. *State of New York,* 176 Misc. 925, 263 App. Div. 1056, 289 N. Y. 613; *People ex rel. MacCracken* v. *Miller,* 291 N. Y. 55.)

*John E. Mack* for respondents. I. Claimants are entitled to judgment on the facts and law since the undisputed evidence shows that the escape of the inmate and the resultant fire were due to the negligence of the officials and employees of the institution in failing to take reasonable measures to guard against the escape. II. If, as the Court of Claims assumes, there was negligence in the first instance on the part of the officials and employees of Wassaic State School, that ends the case on the question of liability. Liability is not then lifted because those officials and employees did not foresee that the escapist Flood would set a building on fire if permitted to be at large. It was enough, that within the range of prudent foresight, some form of harm or injury might possibly occur if a mental defective, with a long record of escapes and pilferings, and a mental condition which was growing worse, were permitted to roam the countryside (*Robert* v. *U. S. S. B. Emergency Fleet Corp.,* 240 N. Y. 474; *Munsey* v. *Webb,* 231 U. S. 150; *Condran* v. *Park & Tilford,* 213 N. Y. 341; *Meisle* v. *N. Y. C. & H. R. R. R. Co.,* 219 N. Y. 317; *O'Neill* v. *City of Port Jervis,* 253 N. Y. 423; *Shattuck* v. *State of New York,* 166 Misc. 271, 254 App. Div. 926; *Benson* v. *State of New York,* 52 N. Y. S. 2d 239; *Calabria* v. *State of New York,* 176 Misc. 925; *Weihs* v. *State of New York,* 267 App. Div. 233; *Jones* v. *State of New York,* 267 App. Div. 254.) III. The case record and the conduct of Flood at the State school prior to the fire, gave ample notice to that institution that he was dangerous to be at large. (*Sporza* v. *German Savings Bank,* 192 N. Y. 8; *Foley* v. *State of New York,* 294 N. Y. 275.)

FULD, J. On the night of February 19, 1936, Francis Flood, an eighteen-year-old moron, ran away, or, as it is technically termed, " eloped " from the Wassaic State School in Amenia,

New York, a public institution for the care and treatment of mental defectives, where he had been for about four months. Coming to a lumberyard in nearby Dover Plains, he entered an unlocked barn owned by Anthony Wathley, one of the claimants in this case. Since it was sub-zero weather and he was thinly clad, he kindled a fire in a bucket, using matches and cellophane which he had taken with him and pieces of straw which he found lying loose atop some bales of hay. When he felt sufficiently warmed, he resumed his flight — first turning the bucket upside down in the belief that that was the way to put out the flame. Unfortunately, however, the fire blazed and spread, causing the property damage for which Wathley and his coclaimants — two insurance companies which became subrogated to his rights to the extent of payments made to him under policies insuring the property against loss by fire — commenced this action upon consolidated claims for recovery against the State on the ground of negligence.

Flood had previously escaped many times from the Rome State School — where he had spent about nine years prior to entering Wassaic in October, 1935 — and once or, perhaps, twice before from Wassaic. Eighteen years of age, he was a high grade moron with an I.Q. of 66, only slightly below the dividing line, and a mental age of a boy of ten and one half years. While his judgment was deficient and while he demonstrated a definite inability to learn or to progress at school, he possessed no other important mental defect or disturbance. Neither his extensive case history nor the evidence in the case revealed that he had any criminal tendencies or that he had ever before caused injury to either person or property. Nothing in either his history or his record furnished the slightest basis for a belief that it was dangerous for him to have matches or that he might start a fire.

The Court of Claims dismissed the claims after trial, holding that the State could not reasonably have anticipated the fire damage on the basis of Flood's prior record; that his elopement was neither the result of negligence nor, at any rate, the proximate or responsible cause of the fire; and that his supervision and treatment by the Wassaic authorities were proper and reasonable under the circumstances. The Appellate Division reversed and found that the State was guilty of actionable negligence.

The Court of Claims correctly decided in favor of the State Since dismissal of the claims is required as a matter of law, there is no need to consider the question of the weight of the evidence.

Wassaic State School was maintained, in accordance with constitutional mandate (N. Y. Const., art. XVII, § 4), for the care and treatment of the poor and indigent mental defectives, of the State (Mental Hygiene Law, § 120). "Mental defective" is defined as "any person afflicted with mental defectiveness from birth or from an early age to such an extent that he is incapable of managing himself and his affairs, who for his own welfare or the welfare of others or of the community requires supervision, control or care and who is not insane or of unsound mind to such an extent as to require his commitment to an institution for the insane * * * " (§ 2, subd. 3, at present, subd. 9). Persons "in confinement on a criminal charge" may not be admitted to the school (§ 121).

In short, mental defectives are not received at Wassaic for the purpose of incarceration; they are there, to quote the language of the statute, for "care and treatment". The school, consistent with statutory policy and purpose, functions for the benefit and training of its charges, there being in prospect the restoration of the individual to a useful place in society. It was, in every sense, an open institution, one without walls or bars.

Toward the inmate Flood, the State had a "quasi-parental power"— bound, Sir Frederick Pollock has observed, to use more diligence in informing itself what treatment was proper for him than a parent would be bound to use. (Pollock on Law of Torts [new American ed., 1894], pp. 150–151.) So far as third persons were concerned, though, the State stood *in loco parentis*. (Cf. Restatement, Torts, §§ 316–317.) The State owed the community, the outside world, no greater duty than would parents under similar circumstances. In the absence of reason indicating a need to isolate him, neither parent nor State is under the necessity of locking him up or keeping him under constant surveillance. (*Calabria* v. *State of New York*, 289 N. Y. 613.)

No hazard being apparent, Flood's act cannot render the State responsible for the resulting damage. As Chief Judge CARDOZO phrased it in *Palsgraf* v. *Long Island R.R. Co.* (248

N. Y. 339, 344): "The risk reasonably to be perceived defines the duty to be obeyed," and that test has, in principle, been consistently applied by the courts in determining whether to impose liability upon the State where injury befalls the patient who elopes from a public institution (*cf. Calabria* v. *State, supra; Martindale* v. *State of New York,* 269 N. Y. 554; *Shattuck* v. *State of New York,* 166 Misc. 271, affd. 254 App. Div. 926) or a third person who is assaulted by an escaped inmate of a mental hospital (*Weihs* v. *State of New York,* 267 App. Div. 233; *Jones* v. *State of New York,* 267 App. Div. 254), or where property is damaged by such an inmate. (*Benson* v. *State,* 52 N. Y. S. 2d 239.)

Regulations of the State Mental Hygiene Department, it is true, required the Wassaic authorities "to lock up all  *  *  * matches " to search the clothing of patients for prohibited articles at regular intervals, and to keep elopers " under close and constant observation." From that standpoint, the State may have been negligent in not assuring compliance with the regulations and in not making certain that the boy did not elope. But such conduct, while perhaps a wrong in relation to its ward and to the institution itself, could not be regarded as a wrong to the community or to third persons, such as claimants herein. Even if the State acted negligently with respect to Flood or the institution, that fact does not entitle claimants herein to sue " as the vicarious " beneficiaries of the breach of duty owed to others. (*Palsgraf* v. *Long Island R. R. Co., supra,* p. 342.)

With the foregoing principles in mind, we fail to find basis for the imposition of liability upon the State. The authorities at Wassaic could not reasonably have anticipated — from his history of harmless elopements — a Flood likely to set fires, or otherwise dangerous, while at large. That being so, and since the boy was neither insane nor criminal, it owed no duty to claimants or other members of the outside world to guard him closely or to see to it that he did not leave the institution.

A situation somewhat analogous to that here involved was presented in *Prudential Society, Inc.,* v. *Ray* (207 App. Div. 496, affd. 239 N. Y. 600). There, an incompetent had pledged with plaintiff pawnbroker a valuable diamond ring which her husband, who was also committee of her person and property, had given her. As the husband — defendant in the action predicated upon his asserted negligence — knew, she had long been in

the habit of pawning jewelry and giving away clothing; in fact, the husband had previously replevied articles pledged by her. However, for sometime prior to the act of pledging referred to, she had apparently been normal and, indeed, her physicians had advised the husband to treat her as a normal person and not to keep her under restraint. In a suit for damages, after defendant had replevied the ring, it was held that the husband was not guilty of any breach of duty owed to the pawnbroker, since the wife's condition at the time was not such as to require confinement. (See, also, *Ballinger* v. *Rader,* 153 N. C. 488, 151 N. C. 383; *Hullinger* v. *Worrell,* 83 Ill. 220.)

Decision herein has a significance which transcends the issue of whether or not a money recovery should be allowed. In time gone by, mental defectives were confined and kept under constant surveillance. Medical and psychiatric advances, demonstrating the inadvisability of that system, prompted the State to abandon it and adopt the modern and therapeutically approved method of allowing the moron a freedom of action without close and continual watching. To hold the State liable in a case such as the present may have an inimical and retarding effect on the treatment of mental defectives. The State, faced with accepting responsibility as an insurer of any damage the moron might cause, may well be tempted to depart from its salutary procedure, may well be influenced to revert to the outmoded and disadvantageous system of confining the mental defective, of keeping him under constant surveillance, while he is being trained to make those social adjustments essential to independent and successful living.

A balance must be struck between contending interests — (1) the State's duty to treat and care for its mental defective wards, with an eye toward returning them to society more useful citizens, and (2) the State's concern that the inmates of its institutions cause no injury or damage to the property of those in the vicinity. That balance may be hard to achieve. We keep within settled legal principles, however, if the State is held only to a duty of taking precautions against those risks " reasonably to be perceived " (*Palsgraf* v. *Long Island R.R. Co.,* *supra,* p. 344), and if the community assumes the risk of accidental loss or damage to property by an inmate of an open institution such as Wassaic.

In each action, the judgment of the Appellate Division should be reversed and that of the Court of Claims affirmed, with costs in this court and in the Appellate Division.

CONWAY, J. (dissenting). The question presented for our consideration is the extent of the duty of the State to the owners and tenants of dwellings and outlying buildings adjoining property taken by the State for the purpose of housing mental defectives from surrounding counties and New York City. On the facts here we think there is no question as to the negligence of the State: the rules of the Mental Hygiene Department then in effect at this school show that elopers were to be kept " under close and constant observation ", and the practice of the school was to provide constant attendance upon patients when they were outside the school buildings and to lock the doors at night when they were inside. When the State itself took these precautions it may not at the same time deny the necessity for them. Mental Hygiene Law, section 2, subdivision 3, makes the welfare of the community as well as the welfare of the mental defective reason for " supervision, control or care ".

There is no question here but that Flood was an eloper. He had eloped from Rome State School and police officials found him wandering in the city of Poughkeepsie. From there he was taken to Wassaic State School and later, on November 1, 1935, formally transferred from the custody of the Rome State School to that of Wassaic State School. The case record from Rome State School, which was sent to the officials at Wassaic, revealed that Flood had " had to be kept on a lock-up ward " because of " his proclivity of running away ". The case record showed that he had eloped " at least four times " from the Rome State School. When he reached Wassaic, since he was suffering from a communicable disease, he was placed in the ward of the hospital. On November 6, 1935, he escaped from that hospital ward through an open window, but was later returned to the hospital. The nurse who left him without supervision on February 19, 1936, went on duty in the hospital ward on November 23, 1935. No notice was ever given her that Flood was an eloper, nor that he had run away from Wassaic on November 6th. She was alone in the ward with about forty patients. Under instructions from one of the doctors she took ten or twelve of the patients, Flood among them, to the basement for a smoke at about seven

o'clock in the evening. After she lighted their cigarettes (since they were not permitted to have matches), she left them unattended for about ten minutes. During those ten minutes, so little supervision was there in the institution that Flood had the time and the opportunity to go upstairs to a bathroom where he had hidden some clothing *three days before* and to come down again and dress. Clearly there was negligence in supervision. One extra nurse in a hospital ward would have prevented the destruction of very considerable property. Patients in hospital wards in all hospitals, whether institutional or not, are always supervised. Particularly is that the case where the patients are suffering from communicable diseases. The alternative is not iron bars or armed guards. We do not think that in order to avoid engaging an extra nurse, or even several, or a proper number of employees, so that there may be proper supervision, that those who administer the Department of Mental Hygiene and the appropriate boards of visitors would place all these mental defectives, whether in hospital wards or not, under lock and key as prisoners. Yet that is what the State urges is the necessary result if it must pay his fire loss to the individual claimant, whose loss was so great that it exceeded his insurance coverage.

If there be negligence in supervision, then the only question is whether the conduct of the boy Flood should have been anticipated. As to that, we need do no more than quote the testimony of the clinical director of the school, who said that it is " impossible to state " what these patients will do in the future, whatever their past records. In addition, the claimants' expert witness testified that in his opinion Flood's judgment was so defective that danger from any fire which he set anywhere could reasonably be anticipated and that it was not safe for Flood to be at large.

The judgment should be affirmed, with costs.

LOUGHRAN, Ch. J., DESMOND, TOWNLEY* and HINKLEY†, JJ., concur with FULD, J.; CONWAY, J., dissents in opinion in which THACHER, J., concurs.

Judgments reversed, etc.

---

* Designated pursuant to section 5 of Article VI of State Constitution in place of LEWIS, J., disqualified.

† Designated pursuant to section 5 of Article VI of State Constitution in place of DYE, J., disqualified.