BESSIE D. WILLIAMS, as Executrix of ALBERT WILLIAMS, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30880.)

Court of Claims, November 30, 1953.

*Louis Young* and *Raymond J. Barth* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Edward R. Murphy* of counsel), for defendant.

RYAN, J. Upon all the evidence in this case we make a finding that the State of New York, its officers and employees were negligent in permitting the escape from the Auburn State Prison farm at Sennett of one Kennedy, a convict. Kennedy was serving time for a crime of violence, viz.: attempted robbery, third degree. The charge specified '' with armed accomplice robbed taxi driver of money and watch at night.'' Although there was no entry in his record of previous attempts to escape and although Kennedy's eligibility to be assigned for work outside the prison walls had apparently been determined in accordance with the administrative rules of the prison relating to minimum security conditions for prisoners, there was nevertheless a laxity in guarding him at the farm and he took advantage of it and got away. Nor were the State's officers suffi-

ciently diligent in searching for Kennedy, although the escape was reported to the prison and the alarm given there with reasonable promptness. However, an available siren at the farm was not sounded and the prepared plan of road blocks was ineffective either in design or in execution. Had it been effective Kennedy might have been captured at a certain highway intersection where he was seen but not detected about three and one-half hours before he was ultimately apprehended and before his path crossed that of this claimant's testator.

We dislike to engage in extended narrative but it seems necessary in this case to recite events in detail. Kennedy escaped between 12:30 and 12:45 P.M. on April 21, 1951. At about 2:00 P.M. one E. A. Clark, sales manager for Shepard Nurseries, saw a man whom he later identified as Kennedy at the nursery which is located at the County Line Road and Route 20 and about three miles from the prison farm. The man was walking east toward the home of Albert Williams which is 400 or 500 yards from Clark's place of business and on the opposite side of the road.

Williams was a farmer, sixty-six years of age. His home was about one and a half miles west of Skaneateles. At about 1:20 P.M. on the date mentioned Williams, accompanied by his wife, had left their home in a light truck, which he operated. They went to Skaneateles, where Mrs. Williams did her shopping. At about 2:00 P.M. her husband left Mrs. Williams at her sister's home and started to return to his own home with the things purchased. Mrs. Williams intended to make the return trip by bus at 4:00 P.M.

At about 2:20 P.M. one Donald Clark, an acquaintance of Williams, was engaged in delivering oil at a gasoline service station situated between the Williams' home and Skaneateles. Clark saw Williams in his truck stop on the highway directly across from the gasoline station. Williams stopped for " 10, 20, or 30 seconds," " was sort of gesturing with his hands," and " finally drove on." Williams was then accompanied by a man whom Clark later identified from a photograph as being Kennedy. Neither E. A. Clark nor Donald Clark knew of the alarm for the escaped Kennedy until half an hour or more after they had seen him. Kennedy's garb did not betray that he was a convict.

At about 2:30 P.M. one Pittman, who had been acquainted with Williams for twenty-five years, knew of Williams' condition of health, had ridden with Williams in an automobile and had observed and knew of Williams' manner of driving, was

himself operating his automobile in a westerly direction from Syracuse towards Marcellus. At a point about two miles east of Marcellus Pittman " met the truck of Mr. Williams coming towards me, and as we met he sat right up like that, hanging onto the wheel, and he was driving at a fast rate of speed," " probably 45 or 50." Pittman had never seen Williams drive rapidly before. On this occasion there was a man on the seat beside Williams, a man whom Pittman did not recognize.

At 3:15 P.M. Williams was found by one Hillman in front of his home in Marcellus, sitting on the running board of his truck which was headed toward Skaneateles. Williams had been vomiting. He looked deathly sick and was getting worse. He was taken into the Hillman home. An ambulance was called and he was taken to a hospital where he died the next day of a subarachnoid hemorrhage, or a hemorrhage around the brain. Williams had been a diabetic for ten years, had had some hypertension, but under medical treatment and advice, which he was following, had been living a normal, useful and productive life. The uncontradicted medical opinion is that the hemorrhage was induced by fright. An autopsy disclosed no gross evidence of advanced arteriosclerosis. It also disclosed no trauma anywhere on the body of the deceased.

As Williams did not live to tell his story in court, some of the details of what occurred are missing. Statements that Williams made before he died were excluded as hearsay except that his physician's testimony that " he told me that he was forced into his car " was permitted to stand as a statement obtained by the physician as part of the history of the case when he was called to attend his patient. We make no finding based on that statement. But from all of the incidents hereinabove narrated it is safe to conclude that Williams was forced by Kennedy to drive him in a direction away from his farm home and that Williams was frightened and died from shock.

Kennedy was apprehended at about 5:30 P.M. by a police officer in Syracuse. He was carrying Williams' sweater. He was also carrying a cultivator blade, a sharp piece of steel six inches long attached to a bracket, a heavier piece of steel, both parts of a farm implement of a kind which was in use on the Auburn prison farm and which could have been procured from such a piece of machinery or from one of several junk piles which, it was testified, existed on the farm. Kennedy dropped the sweater and disclosed the blade in his hand. He threatened the police officer, who was in uniform and armed and who took Kennedy into custody.

When Williams left his wife he was wearing his sweater over a blue work shirt. The witness Donald Clark did not describe how Williams was dressed when he saw him. The witness Pittman observed the blue work shirt but did not mention the sweater. There is no proof as to the manner in which Kennedy possessed himself of Williams' sweater. An inference that he forcibly took it from Williams' body has no firmer basis than an inference that Williams himself removed his sweater and that Kennedy picked it up. Possession of the sweater by mere theft would not, by itself, establish that there was an attack upon decedent's body. And, as the autopsy disclosed no evidence of trauma, the record is devoid of a showing of physical impact contributing to the fright which resulted in Williams' death.

Must the State of New York respond in damages for the death of Williams? The State invokes the rule in *Mitchell* v. *Rochester Ry. Co.* (151 N. Y. 107, 110), and asserts that the question must be answered in the negative. The rule was stated as follows: " no recovery can be had for injuries sustained by fright occasioned by the negligence of another, where there is no immediate personal injury."

The rule was greatly liberalized in *Comstock* v. *Wilson* (257 N. Y. 231, 233), wherein the late Chief Judge LEHMAN reviewed the criticisms of the rule by legal scholars and the contrary conclusions of other jurisdictions and, writing for a unanimous court, determined that it was not error for the trial court to refuse " defendant's request to charge that ' if the jury find that the deceased at the time of the collision sustained only shock or fright, without physical injury, they must find for the defendant.' " In the *Comstock* case the collision between the two automobiles was slight, causing some noise, or " grating sound " and loosening a fender of the car in which the deceased was riding. She stepped from the automobile, fainted and fell to the sidewalk thereby fracturing her skull. Judge LEHMAN said (p. 239) : " That injury was not confined to fright. The fright was only a link in the chain of causation between collision and fractured skull. The collision itself, the consequent jar to the passengers in the car, was a battery and an invasion of their legal right. Their cause of action is complete when they suffered consequent damages."

The important word in the foregoing excerpt is " battery " and the important fact to be remembered from the *Comstock* case is that the battery was trivial in its impact. Yet it was held to be a sufficient basis on which to rest liability for injuries

due to the concurrent shock. The *Comstock* case boldly evidences the desire of courts in this and other jurisdictions to get away from the rule of nonliability. Indeed, long before the *Comstock* case was decided, the Court of King's Bench in England had rejected the rule. (*Dulieu* v. *White & Sons* [1901], 2 K. B. 669.) It thereby repudiated the earlier decision in *Victorian Rys. Comrs.* v. *Coultas* (13 App. Cas. 222), on which our Court of Appeals had relied together with *Lehman* v. *Brooklyn City R. R. Co.* (47 Hun 355) in deciding the *Mitchell* case.

Exceptions to the rule have been found by New York courts in certain cases involving contaminated food, notably *Barrington* v. *Hotel Astor* (184 App. Div. 317); *Carroll* v. *New York Pie Baking Co.* (215 App. Div. 240), and *Sider* v. *Reid Ice Cream Co.* (125 Misc. 835).

And where the tort committed was wanton, reckless and mischievous, as distinguished from a mere lapse of ordinary prudence, liability was established. (*Beck* v. *Libraro,* 220 App. Div. 547.) Here the act committed was wanton. Kennedy was armed. As we have already stated, all of the incidents testified to point to the conclusion that Williams was forced by Kennedy to drive him in a direction away from his home. That act was an invasion of Williams' rights. Actually it was an assault although there is no proof that there was a battery. (*Hays* v. *People,* 1 Hill 351; *People* v. *Moore,* 50 Hun 356; 6 C. J. S., Assault and Battery, § 1.) And although the term " immediate personal injury " as used in the *Mitchell* case seems thus far to have been construed as " immediate bodily injury " — though ever so slight (*Comstock* v. *Wilson, supra; Hack* v. *Dady,* 142 App. Div. 510; *Tracy* v. *Hotel Wellington Corp.,* 175 N. Y. S. 100, affd. without opinion 188 App. Div. 923) — it should be noted that the statutory definition of " personal injury " includes " assault " not conjoined with the word " battery " but set off by a comma. (General Construction Law, § 37-a.) Whether or not we apply this statutory definition, there is, upon the authority of the *Beck* case, a clear case of liability were Kennedy the defendant.

But Kennedy is not the defendant in this suit. Nor was he, on April 21, 1951, an agent of the State of New York. *Respondeat superior* does not apply as between Kennedy and this defendant. Kennedy was, however, a ward of the State of New York, one of " those unfortunates who are incompetent in * * * morals " from whose acts the officers and employees of the State are required to exercise that degree of care in

protecting society which persons of common prudence exercise under like conditions. (*Weihs* v. *State of New York*, 267 App. Div. 233.) The tort of the State's employees was a tort of omission of duty. Yet it made possible the wanton tort of Kennedy for it was reasonably to be foreseen that once out of the confines of the prison farm he would use force, if necessary, to perfect his escape. This potentiality is readily distinguishable from Sarrentino's unexpected attack upon Flaherty (*Flaherty* v. *State of New York*, 296 N. Y. 342), and from Flood's careless but unintentional setting fire to Wathley's barn after he had warmed himself by an improvised stove. *Excelsior Ins. Co. of N. Y.* v. *State of New York* (296 N. Y. 40.) Kennedy, on the loose, found Williams, who happened along with his motor vehicle at the right moment, readily available to his purpose. Can it be doubted that, if he had bludgeoned Williams to death or had committed the less serious crime of stealing his truck, leaving him unharmed, the State would be required to respond in damages? We find death as it came to Williams a no less proximate consequence of the laxity of the officers and employees of the State of New York.

An award is directed upon findings which accompany this opinion.