Bussell G. Hunt, J.
The claimant herein for the recovery of damages alleges that by reason of the negligence of the administrative staff of the Division of Parole of the State Executive Department (Executive Law, arts. 3, 12; Correction Law, art. 8), the claimant, a widow of 58 years of age, sustained personal injuries arising out of an assault on December 26,1954, by a 20-year-old parolee who had been placed by the division upon her farm and in her home in Poestenldll, Bensselaer County, where she lived alone, following, it is alleged, representations by members of the staff that the parolee was a fit and proper person, whereas, he possessed, in fact, a criminal *1086 record and a history of vicionsness and violence, which, it is alleged, was not disclosed to the claimant, but, on the contrary, was withheld from her. The Board of Parole is not charged with negligence in the release of the prisoner on parole. It is the Division of Parole which is charged with negligence in the performance of an administrative duty.
The claimant allegedly sues ‘ ‘ in her own right for a wrong personal to her ” (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 342); the wrong was to herself, and, the hazard she was subjected to, she contends, was one which was known and recognized by the division’s staff and was “in the thought of reasonable men [such] an unreasonable hazard” that an invasion of her bodily security would ensue ( id. p. 341; McPartland v. State of New York, 277 App. Div. 103, motion for leave to appeal denied 302 N. Y. 950).
The State contends that there can be no recovery because the parolee was not vicious or violent and there was no risk of danger to the claimant, but, in any event, it is argued, she voluntarily assumed whatever risk existed (see Williams v. State of New York, 308 N. Y. 548).
Parole is the extension of the State prison system outside the walls of correctional institutions which release prisoners on parole and those paroled remain in the legal custody of the respective wardens thereof until the expiration of the maximum terms specified in their sentences (Correction Law, § 213). The release is considered as an aid in the rehabilitation of prisoners and as preparation for their return to society, and, at the same time, it is an aid in the State’s function of providing for an ever expanding prison population (County of Cayuga v. McHugh, 4 N Y 2d 609, 615). In the seven-year period from 1948 to 1954 commitments to these institutions rose almost 30 per cent and releases on parole rose at the same rate (Twenty-Eighth Annual Report of the Division of Parole of the Executive Department, p. 137). During 1954 there were 3,954 persons released from the institutions under the jurisdiction of the Department of Correction, and, in the same year, 1,692 were declared delinquent for violations of the terms of parole (Twenty-Fifth Annual Report of the Division of Parole of the Executive Department, p. 10); a delinquency rate of almost 43 per cent.
The parole of a prisoner is, under subdivision 4 of section 214 of the Correction Law, conditioned upon a finding by the Parole Board that it is satisfied the prisoner will be suitably employed if released, and, section 210 imposes upon the Divi *1087 sion of Parole the duty “ of aiding paroled prisoners to secure employment ”, including those eligible for parole (Thirty-First Annual Report of the State Commission of Correction, p. 27). The duty imposed is one which is actively and aggressively pursued (1953 and 1954 Report of the Department of Correction, p. 23; Tiuenty-Eighth Annual Report of the Division of Parole of the Executive Department, pp. 91-93). In accordance therewith, the 1953 Legislature authorized the addition of three parole employment officers to the division’s staff thus enabling it “to resume full responsibility for the placement program of the Division” (Twenty-Fourth Annual Report of the Division of Parole of the Executive Department, p. 24). There is no doubt that the public authorities, in the discharge of their responsibilities, were “ active in calling upon the citizen for help, and in utilizing his help when it is rendered ” (Schuster v. City of New York, 5 N Y 2d 75, 82), and, accordingly, in such cases, public officials ‘ ‘ must guard against a risk of danger to others where reasonable foresight would suggest a good chance of occurrence and reasonable care suggests steps in avoidance ” (McPartland v. State of New York, 277 App. Div. 103,- 106, motion for leave to appeal denied 302 N. Y. 950). In Poplar v. Bourjois, Inc. (298 N. Y. 62, 67) it was said that “ As a general proposition, liability for negligence turns upon the foreseeability of any harm resulting from the careless conduct, not upon the foreseeability of the exact nature and extent of the injury which does in fact ensue ’ ’. The care to be exercised ‘ ‘ requires precaution as well against the extraordinary as against the ordinary. It is only the unforeseeable in the exercise of ordinary care, or the act of God, that exculpates the negligent wrongdoer” (Daly v. State of New York, 226 App. Div. 154, 157).
In the Summer of 1954 the claimant accompanied a Mrs. Martin, a Christian Science practitioner and chairman of the board of trustees of a local Christian Science Church, of . which the claimant was a member, to Great Meadow Correctional Institution to interview a prisoner for possible employment by her church as a janitor. This man was between 50 and 60 years of age and was eligible for a release on parole but an offer of employment was a prerequisite to the release. The prisoner had replied to a help-wanted advertisement which Mrs. Martin had placed in the Christian Science Monitor. Because of his prior record and the nature of the felony for which he was imprisoned, and, upon the advice of representatives of the Division of Parole, Mrs. Martin did not employ the man. While the *1088 claimant was at the institution, a State employee informed her that if she were interested in having a prospective parolee to work on her farm she should communicate with the Division of Parole in Albany. She did this and acquainted the staff with her situation as described above. In answer to her inquiry relative to the same prisoner whom Mrs. Martin interviewed, she received the same information and advice given to Mrs. Martin. Eventually, the division recommended to her a 20-year-old prisoner who was eligible for a release on parole. The staff expected the claimant to rely upon them for advice and guidance, as she and Mrs. Martin had done theretofore, and, the recommendation so made was intended to induce the claimant to rely thereon and to take affirmative action; diligence was owing ‘1 to him * * * who relied ’ ’ (Glanzer v. Shepard, 233 N. Y. 236, 242). The acceptance of the prospective parolee for employment was the end and aim of the staff’s recommendation. The prisoner, the claimant was informed, had a prior record of juvenile delinquency, vagrancy and a conviction in the County Court of Kings County for attempted robbery in the third degree, following the theft of a purse from an elderly woman. There was no full disclosure of the prisoner’s record as hereinafter set forth.
The division’s supervisor of parole employment testified that in making the recommendation he regarded the parolee as “ a good risk on a farm ”, but, he also testified, contradictorily and inconsistently, that, at the time, he would not have attempted to predict what new crime the prisoner might commit and admitted that there was a chance or possibility that he might repeat the “mugging”, which, upon the trial, was the description given of the robbery committed in Brooklyn; a “mugging ” is a crime of violence (Penal Law, § 2126). The senior parole officer of the division, a woman, after reviewing the parolee’s history and record, disapproved the recommendation of the employment officer upon the ground that the parolee was not a proper and fit person to live with the claimant alone on her farm in a rural area. A superior overruled her because of the parolee’s youth and reports that he had “ responded ” well in the institutions where he had been confined, although this has to be qualified by a report of fighting with other inmates and of acts of perversion, said to have been under compulsion. He testified he did not consider the parolee to be an unsafe person, although, the “ordinarily prudent person” (1 Shearman and Redfield, Negligence [rev. ed.], p. 6) could disagree in the light of the parolee’s record herein. “ The question was not *1089 whether this motorman was convinced that he conld pass the automobile in safety, but whether the prudent and competent motorman, acting prudently, would have been so convinced ” (Mertz v. The Connecticut Co., 217 N. Y. 475, 477). “ The judgment required to be applied, as well as the risk of liability to be assumed, was based on what a man would regard as likely to happen, and this could be predicated only on what he knew, or should have learned, had happened in the past ” {McPartland v. State of New York, 277 App. Div. 103, 106). Good conduct or efficient performance of duties ” in prison are not grounds alone for a prisoner’s release on parole (Correction Law, § 213), and should not have been given weight in the employment placement of a parolee, as was done here.
The record shows that the parolee was born on September 24, 1934, in a large city in another State and because of an unstable family and an insecure home life during his early years he was without guidance, discipline and aid in his development. On June 24, 1949, he was convicted in his home city of attempted larceny in a building, and, sentence was suspended. On October 27,1949, he was committed to a State training school for truancy and on February 16,1951, he was arrested again for truancy but he defaulted in appearing on an adjourned date. The next entry in the record is for May 23, 1951, when, at the age of 16 years, he was arrested with a man in New York City and charged with a violation of subdivision 8 of section 722 of the Penal Law (“ soliciting men for the purpose of committing a crime against nature or other lewdness ”) to which he pleaded guilty. He was unemployed and had been in New York City and without work for the prior three months and had been sleeping in theatres and other public and semi-public buildings and places. The parolee’s parents did not go to his aid, although informed of the arrest. On June 27, 1951, he was sentenced to 60 days’ imprisonment, but the execution thereof was suspended on condition he return to his home, and, private funds were given to him to do so. On September 24, 1951, he entered the United States Army but was discharged in May, 1952 with an undesirable discharge — the grounds are not stated in the record. He then remained in the vicinity of his home for about one month and without employment. Thereafter, he returned to New York and worked in Brooklyn for a short time, but, left that employment because he “ could not get along ” with the supervisory personnel and he remained unemployed until his arrest on October 6, 1952, upon the multiple charges of robbery in the second degree, grand larceny, first degree, and, assault, *1090 second degree. He was indicted on these felony charges. His arrest and indictment arose out of an attack at about 7:00 p.m., on October 6, 1952, on a 72-year-old woman who was ascending the stairs of a subway station in Brooklyn. He ‘ ‘ mugged ’ ’ her by coming upon her from the rear and throwing his right arm around her neck, thus preventing an outcry and at the same time cutting off the wind to prevent a struggle for release and to compel surrender; with his other hand, he opened her pocketbook and took a wallet containing five dollars; he then pushed her against a fence and ran. The woman was unable to make an outcry, she was ‘ ‘ pretty well shaken up ’ ’. The extent of her injuries does not appear in the evidence. The suspicions of a policeman were aroused when he saw the parolee running along a street, looking back over his shoulder, and, upon overhauling and searching him, found the complaining witness’ purse containing five dollars, a Bohm automatic pistol (capable of firing-blank cartridges only), and, a knife. The parolee admitted he had “mugged” the complainant and stolen her purse. His statement showed that he had waited at the subway station for about one hour and had intended to commit a holdup. He admitted the claimant presented a victim for him because of her appearance of age and defenselessness. The police officer, within a short time, traced the complainant through identifying material found in the purse and she identified the parolee as her assailant. On November 6, 1952, the parolee pleaded guilty to the reduced charge of attempted robbery, third degree, and was committed to the Elmira Beception Center on December 2, 1952. There he was classified and eventually transferred to Great Meadow Correctional Institution, where he remained until September 16,1954, when he was released on parole and immediately brought by the division’s employment officer to the claimant’s farm where he was provided with his own room in her home. All of the foregoing were well known to the staff of the division. The division’s records and the evidence herein, show the parolee was unstable, untractable, unpredictable, assaultive, perverted and violent.
A parole officer visited the farm weekly to supervise the parolee and he received reports that were favorable. In December 1, 1954 the parolee was given permission to make a visit at Christmas time to his home outside the State. Upon his return on December 26, 1954, he was met at the railroad station by the claimant and driven to the farm where he went to his room, and, shortly thereafter, returned downstairs to talk with the claimant, after which he returned to his room. As the claimant *1091 was hanging her coat in a clothes closet, the parolee, returning to the lower floor, in his bare feet, stole upon her from the rear and put an arm about her neck and choked her; she fell to the floor unconscious. Upon regaining consciousness, she was speechless, her head, neck, throat and chest pained and her vision was temporarily blurred. She was partially disabled for about three months although it is alleged she had not regained the full use of her voice up to the time of the trial herein. She was not treated or examined by a medical doctor until June, 1958. He then found no residual effects of the assault. The parole officer was notified the next day by Mrs. Martin, to whom the claimant went for advice, and, the parolee was returned to the institution. The delay is ascribed to compassion for the transgressor who had expressed fear of the revocation of his parole and a recommittment to complete his sentence.
Even though Mrs. Martin and the claimant were intent on attempting rehabilitation and affording help to a transgressor, thus in aid of the State’s policy, this is not taken as a willingness on their part to assume a risk of danger for themselves, their church or their neighbors. It was never the intention of the Legislature in enacting the provisions for the parole of prisoners, and, it is not public policy, that the uninformed, unsuspecting and unimowing citizen who collaborates with the public authorities should be subjected to a vicious and violent criminal (Schuster v. City of New York, 5 N Y 2d 75, supra). Since a release of a prisoner on parole must be “not incompatible with the welfare of society” (Correction Law, § 213), surely, the placement of the parolee in the home and on the farm of this claimant, under the particular facts herein, must be subject, at the very least, to a like injunction and duty. It is possible that an employment placement for this parolee could have been found consistent with the injunction, but, the placement of a known vicious, perverted and assaultive parolee in the home and on the farm of a 58-year-old woman living alone in a remote rural area cannot be said to be in conformity. Subjecting this claimant to an acknowledged risk of danger is not consonant with the duty with which the Division of Parole is charged. The staff of the division saw the risk of danger' to the claimant, and, this, defined ‘ ‘ the duty to be obeyed ’ ’, the possibility of an attack upon her “was clear to the ordinarily prudent eye” (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 344, supra) and she was entitled to be protected. “ ‘ Negligence is the absence of care, according to circumstances ’ ”, p. 341). Absence of care, under the facts and circumstances herein, was surely *1092 demonstrated. The occurrence was a “predictable” casualty (McPartland v. State of New York, 277 App. Div. 103, 107, supra). The duty to which the State is here held is that “ of taking precautions against those risks ‘ reasonably to be perceived ’ ” (Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40, 46). In this, there was a failure which led directly to, and, was the actual cause of the assault upon the claimant (Laidlaw v. Sage, 158 N. Y. 73; McDonald v. Central School Dist. No. 3 etc., 179 Misc. 333, affd. 264 App. Div. 943, affd. 289 N. Y. 800; Rugg v. State of New York, 284 App. Div. 179). There was no intervening cause.
The claimant did not have the same knowledge or information concerning the parolee as that possessed by the representatives of the Division of Parole and she relied upon them and upon their advice and recommendation in taking the parolee to live and work with her on her farm, and, thereby, she was subjected to a danger. There is no evidence that the claimant was indifferent to consequences, or, that she assumed a risk, known to her. ‘ ‘ In strictness, however, to make out acceptance of the risk there must be foresight of the consequences ” (McFarlane v. City of Niagara Falls, 247 N. Y. 340, 349); the “ act of the plaintiff to prevent recovery must amount to being informed of the dangers in his path and then being willing to encounter them” (Delaney v. Philhern Realty Holding Corp., 280 N. Y. 461, 465). Such is not the case here. The recommendation by those who held themselves out as experts in their field, and, under a duty to protect the citizen, was sufficient “ to lull the plaintiff into inactivity” (Syracuse Lighting Co. v. Maryland Cas. Co., 226 N. Y. 25, 36; Metropolitan Life Ins. Co., v. Childs Co., 230 N. Y. 285, 292; see, too, Glanzer v. Shepard, 233 N. Y. 236, supra); the claimant neither voluntarily assumed a known risk nor was she at fault.
Judgment is awarded to the claimant pursuant to decision made and filed herewith.