Caroline K. Simon, J.
Luisa Soto was appointed administratrix of the estate of her deceased daughter, Meli Soto, by Surrogate McGrath of Bronx County on November 5, 1965. Thereafter she filed this claim for wrongful death due to the alleged negligence of the State of New York, its agents, servants and employees in its care and treatment of the deceased while she was a patient in Bronx State Hospital, New York City. This claim, timely filed with the Clerk of the Court of Claims and in the office of the Attorney-General on December 23, 1965, has neither been assigned nor submitted to any other court or tribunal for hearing or determination. It seeks a total of $500,000 in damages.
Claimant’s daughter, Meli Soto, was born in Puerto Bico on September 2, 1946. She was three years old when she was *1036 brought to New York by her parents in 1949. The medical records disclose that her parents separated when she was six years old and her father was institutionalized at Pilgrim State Hospital. She became regressive, withdrawn and hallucinative, and her conduct during the ensuing 11 years was characterized by delusions, depressions, and general disorientation.
On February 19, 1964 she was admitted to Jacobi Hospital in The Bronx, and the medical record (Claimant’s Exhibit 8) notes the following: ‘ ‘ This is a 17 year old girl who is admitted because the family is experiencing increasing difficulty in controlling her at home. * * * visual hallucinations * * * acting wild at home ”.
She was termed “ unmanageable and assaultive ” and sedation and restraint were prescribed for her “ agitated” condition. For the next six days she remained in a secluded ward, and Exhibit 8 notes difficulties in feeding her.
On February 25, by order of a Supreme Court Justice, Meli Soto was certified as a mentally ill person, and was committed to Bronx State Hospital upon the petition of her mother and the certification of two examining physicians. Upon her admission the following day, she was diagnosed as “ Schizophrenia, Catatonic Type
The hospital records, after noting Meli’s catatonic state upon admission, included references to “ stereotyped movements, poor impulse control * * * mute * * * no verbal contact possible ”.
Mrs. Soto’s testimony was translated by a Spanish-speaking interpreter provided through the co-operation of the New York City Civil Court. She stated that she visited the hospital two or three times and found her daughter in a wheelchair. She testified further that she brought food which her daughter ate, and that she spoke to Meli, but received no response. On March 17 she received a telegram informing her that Meli was very sick, and when she reached Bronx State Hospital she found her daughter under oxygen.
The records indicate that on March 15 the girl developed a fever of 100 degrees and received penicillin. On March 17 her temperature was taken at 6:00 a.m. and found to be 106 degrees, with shallow breathing. The doctors sent her to Jacobi Hospital for evaluation and the latter institution notes that Meli Soto expired at 2:06 p.m. that afternoon of a cardiac arrest, despite emergency resuscitative measures to which she failed to respond.
The following day, March 18, an autopsy was performed, and claimant’s counsel offered a certified copy of the Medical Examiner’s report. The State objected to that portion relating to *1037 the cause of death. The court sustained the State’s objection to that portion. For the use of autopsy reports as evidence, see Fisch, New York Evidence (§ 954, p. 469) and Kramer, Buies of Evidence in Negligence Cases (3d ed., pp. 17 and 18). The remainder of the autopsy report was accepted into evidence as Exhibit 9. The following is excerpted from it:
‘1 FINAL ANATOMICAL DIAGNOSIS
‘ ‘ Congestion of the brain, lungs, kidneys, liver Atelectasis of the left lung ”.
The Bronx State Hospital Supervisor in charge of psychiatry, in an examination before trial and in testimony before this court, stated that Meli Soto’s medication chart indicated that tranquilizers were prescribed, but not barbiturates. She testified that the hospital routine required the nurse to take each patient’s temperature in the morning and again at night, and to note any increase in it. The hospital records (Exhibit 6) contain the following nurses’ notes
“ 3/13/64 Pt. Soto has temp of 101.8 — extreme diaphoresis. Penicillin & aspirin order — bed rest maintained. Mental condition apparently same.”
“ 3/16/64 Temp 104. Penicillin & A.S.A.+tetrecycline ordered. Pt. very lethargic. Fluids forced ”.
“ 3/16/64 Pt. on Bed Rest Temp. 104 at 4 pm. * * * Temp at 9 pm 102 ’ ’.
“ 3/17/64 temp 106.8 place on Critical, given Aspirine x at 1:20 Alcohol sponges given at 2:30 oxygen. Pt. Condition appears the same. Sean by Preast.”
“ 3/17/64 Pt has temp of 107. Apical pulse 176 Resp. 34. Profuse diaphoresis. Penicillin 300,000 * * * 02 tent maintained at 11 liters * * * transferred to Jacobi Hospital via ambulance.” (Spelling as it appeared in report.)
The supervising psychiatrist testified that all medications were kept locked in the drug room, that the nurse in charge had the only key, that all drugs administered were recorded on the patient’s chart and no patient nor attendant had access to them. She also stated that she did not recall any blood tests having been taken between the time the patient’s temperature first began to rise and her transfer to Jacobi Hospital, nor did Exhibit 6 indicate any such tests.
She stated that the doctor assigned to the case would be responsible for the care, and that she, as Supervisor, would assist when special problems arose. She also informed the court that the ward doctor then in charge of Meli Soto was no longer with Bronx State Hospital, nor was he in this country. It was her *1038 practice, she said, to make ward rounds twice daily. On rounds she would examine sick patients, or any others brought to her attention by the nurses. The nurses would make notes of treatment prescribed or comments on condition.
The Supervisor testified that she could not recall having examined Meli Soto before March 17. The hospital record contains no entry of her having done so. She stated that on that date she found the patient to be unresponsive, with a high temperature, and described her condition as moribund. It was at this point that she ordered the patient transferred to Jacobi Hospital.
The court, in its consideration of the question of liability of the State for this unfortunate death, is guided by the basic principle enunciated in Palsgraf v. Long Is. R. R. Co. (248 N. Y. 339, 344) by Chief Judge Cabdozo when he said: ‘ ‘ The risk reasonably to be perceived defines the duty to be obeyed ”.
The State, though required to furnish such reasonable care and attention to its patients as their condition may warrant, is not an insurer. (See Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40; Flaherty v. State of New York, 296 N. Y. 342.)
It is axiomatic that the State has a duty to take every reasonable precaution to protect patients in its institutions from injury. Furthermore, the degree of care which the law exacts from those in charge of an institution for the mentally ill toward its patients is ‘ such reasonable care and attention for their safety and the safety of others as their mental and physical condition, if known, may require, and should be in proportion to the physical and mental ailments of such patients.” (See 27 N. Y. Jur., Hospitals and Asylums, § 86.)
Particularly is this obligation an imperative when the patient is a mentally retarded person. The State, when it exercises a quasi-parental power, is bound to use more diligence in determining the appropriate treatment for a patient than a parent would be bound to use. (See Pollock, Law of Torts [new Amer. ed., 1894], pp. 150-151.)
The question to be determined is whether the State, knowing Meli Soto’s physical and mental condition, exercised reasonable care to protect her, to guard her from exposure to dangers she was unable to recognize, and to treat her in a reasonably competent and medically approved manner when her condition deteriorated and she needed special medical care.
Though negligence cannot be presumed, the court finds on the proof presented that the State did not exercise such suitable care nor administer treatment as is recognized and accepted by the medical profession. The State was derelict in its duty to *1039 its ward when it permitted a temperature of 101.8, taken on March 13, to rise to 104 on March 16 without any indication of corrective treatment during the intervening period. The record (Exhibit 6) is singularly void of nurses’ entries on the 14 and 15 of March. The facts in the instant claim differ from those in the State’s citation of Hirsh v. State of New York (8 N Y 2d 125).
Claimant has established, by a fair preponderance of the evidence, that the State failed to provide reasonably adequate care of the decedent. The State, through its expert, has failed to offer any plausible or satisfactory explanation for the sudden decline in the infant’s condition, nor has it presented any evidence that might shed light on the findings noted in the autopsy report (Exhibit 9). The court is constrained to view these circumstances as indicia of inadequate care, particularly in the light of the State’s complete control over the decedent’s environment and activities. ‘ A state institution or hospital treating mentally ill patients may be responsible for inadequate supervision or for failure to give a patient proper or sufficient assistance where it is apparent from his condition that such is necessary.” (27 N. Y. Jur., § 86, pp. 268-269.)
It is true that sudden rises in temperature are commonplace among teenagers within or without State institutions. Here the gravamen lies in the failure of the defendant to prove proper care when the illness struck and immediately thereafter, thus permitting a progressive deterioration ending in death. No proof as to pain and suffering was submitted. The defense has not offered such proof as' to overcome the prima facie case presented by claimant in this death action.
The only evidence of the care provided the decedent is from the medical record and the testimony of the State’s expert. The court finds this evidence inadequate to overcome the presumptions of liability presented to it.
In the instant case the State employee testified that all control and disposition of the drugs lay with the State personnel. Claimant has urged the determination of liability on the res ipsa loquitur doctrine. For this doctrine to prevail, the circumstances surrounding the injury must be under the exclusive control of the defendant, the injured person be without fault, and the injury be such that the exercise of proper care would prevent its occurrence. In such a situation, absent any explanation, reasonable evidence is afforded that there was lack of suitable care. (See 1 Warren’s Negligence [2d ed.], p. 246 et seq.)
1‘ It would seem clear that in the final analysis res ipsa loquitur is more a matter of circumstantial evidence than of legal doctrine. *1040 In other words it applies where the negligence is established by proof of the circumstances rather than by direct evidence. As is previously stated, the circumstances must be proven and these must be such as to indicate negligence. Viewed in that light, there is nothing unusual in the rule. Any fact may be proven by circumstantial evidence as well as by direct testimony.
“ The problem in each case is whether the circumstances unexplained do justify an inference of negligence. Ordinarily, circumstantial evidence is insufficient where the circumstances are consistent with freedom from wrong. In the administration of the law arbitrary rules cannot be substituted for logically probative evidence. The doctrine of res ipsa loquitur is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. It requires evidence which shows at least probability that a particular accident could not have occurred without legal wrong by the defendant. To negative every possibility that the accident occurred in some extraordinary manner which would exculpate the defendant is often impossible. In the administration of the law we must be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible; and it is not necessary for the plaintiff’s proof to exclude or eliminate every other possible cause of the occurrence. We may' be constrained to act upon incomplete evidence where complete evidence is impossible. Then the logical probative force of the evidence produced is measured, in part, by the test of whether it is the best evidence available. So where the instrumentality which produced an injury is within the exclusive possession and control of the person charged with negligence, and such person has exclusive knowledge of the care exercised in the control and management of that instrumentality, evidence of circumstances which show that the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff is sufficient to justify an inference of negligence and to shift the burden of explanation to the defendant.” (Warren’s Negligence, supra, pp. 265-267.)
The fact of the occurrence of the injury and the surrounding circumstances permit an inference of defendant’s culpability and establish a prima facie case, calling upon the State to come forward with an explanation. The doctrine requires also that management and control of the cause of the injury and custody be exclusively vested in the State. Those requirements also are met by the facts in the instant claim.
Plaintiff in a death action is not required to plead and prove freedom from contributory negligence. This statutory exception *1041 to the general rule was found in section 131 of the Decedent Estate Law which has become EPTL 5-4.2, effective September 1,1967.
Section 8 of the Court of Claims Act holds the State liable, under the doctrine of respondeat superior, for the negligent medical acts or omissions of its employees (see Becker v. City of New York, 2 N Y 2d 226). On the evidence before it, the court finds that the failure of the State to provide reasonably adequate care for its ward was the competent producing cause of her death, and that the State must be held liable in damages for this unfortunate event. On the facts before it, the court finds no contributory negligence.
In assessing damages the court considers the physical and mental condition of the infant as militating against a normal and productive life expectancy. Though urged by claimant’s counsel to take judicial notice of the normal life expectancy of a 17-year-old girl to be 53.11 years, the court nevertheless bears in mind the guarded prognosis for a catatonic schizophrenic of that age.
Not wishing to add to the mother’s hurt, no recapitulation of the girl’s mental and physical weaknesses is given here. These deficiencies were many and formed a barrier to an appraisal of her pain and suffering being reduced to a cash evaluation. No proof of her pain and suffering was presented and no award is made for that part of the claim.
The court awards the sum of $2,500 in damages, which includes all pecuniary damages sustained by the claimant, individually and as administratrix and next of kin and distributee of the decedent by reason of the death, together with appropriate interest (EPTL, 5-4.3).
Defendant’s motions to dismiss, made at the conclusion of claimant’s case and renewed at the termination of the trial, for failure to prove a prima facie case, and for failure to prove freedom from contributory negligence, on which decisions were reserved by the court, are now denied.