Caroline K. Simon, J.
Harriet Tropp, claimant’s deceased daughter, was born in New York City in 1941. Her early years were marked by difficulties in school and uncontrollable behavior. She was committed to Letchworth Village in 1952 on her mother’s petition. After a few months she returned home and attended special classes for a time. She was readmitted to Letchworth in 1955. Except for occasional home visits, she remained there until her transfer to Central Islip State Hospital on April 30,1964 at the age of 22.
At her initial mental examination at Central Islip, Harriet’s condition was diagnosed as ‘ ‘ psychosis with other infectious DISEASES, WHOOPING COUGH-ENCEPHALITIS MENTAL DEFICIENCY.”
The record reflects periods of disturbed or assaultive conduct requiring restraint. Thorazine and other sedating drugs were prescribed and administered on a regular basis.
On August 8,1965 at 4:45 a.m. she was discovered to be lying in her bed in the usual sleeping position, but not breathing. Upon examination she was “ found blue in appearance, tongue hanging out and body cold to the touch.” The doctor on duty pronounced Harriet Tropp dead at 5:15 a.m. and indicated that she appeared to have been dead about three hours.
The body was taken to the Suffolk County Medical Examiner’s Office in an ambulance, and a preliminary note on the hospital record reads: “ cause of death: Visceral Congestion — pending further investigation.”
*815 The Medical Examiner’s office performed an autopsy on August 8, 1965 at 3:30 p.m. and listed as the “final cause of DEATH : DRUG INTOXICATION FROM POLYPHARMACEUTICALS
Mrs. Tropp, administratrix of her deceased daughter’s estate, now sues the State of New York for damages due to its alleged negligence in the 1 ‘ maintenance, supervision, care and control of its ward, Harriet Tropp, known to be a retarded and disturbed child and known to have had suicidal propensities ”. She seeks $250,000 as her pecuniary loss, $10,000 for conscious pain and suffering of the intestate, and $950 as funeral expenses.
Mrs. Tropp was granted letters of administration by Surrogate McGrath in Bronx County on December 30, 1965. Notice of intention to file a claim was received and filed by the Clerk of the Court of Claims on March 12,1966. The claim itself was timely filed with the Clerk on March 12, 1966 and in the office of the Department of Law on March 14, 1966. It has neither been assigned in whole or in part, nor tried, nor brought before any other court or tribunal for determination.
During her years at Central Islip, Harriet’s medical record shows repeated attempts at self-destruction and assaultive behavior. Restraining measures, including the use of a camisole, as well as prescribed sedation, were employed to keep her manageable.
From July 19, 1965 through August 7th, the day before her death, Harriet’s medication record showed the following daily entries:
Compazine, 30 mg. Q.I.D.
Equanil, 800 mg. T.I.D.
Librium, 25 mg. Q.I.D.
Miss Beverly Tropp, the deceased’s sister, is a licensed practical nurse. She was living at the Tropp home in 1965. She testified to having visited her sister many times at Central Islip. In February of 1965 she noticed large black and blue marks on her sister’s body. Miss Tropp mentioned this to the doctor in charge and Harriet was examined by him.
Miss Tropp further stated that in May of that year she observed small round spots she termed “ petechia ” on Harriet’s arms and legs, describing them as blood blisters. She again spoke to the doctor about this condition. Miss Tropp contrasted the physical condition in which she saw her sister while at Letch-worth, where she stated Harriet had been lethargic, disoriented, drowsy at all times, having difficulty in holding objects, and falling even in her sister’s presence, with Harriet’s condition at home in February, 1965, when she was more alert, better oriented, better balanced, had no falling episodes, and a good *816 appetite. Moreover, Miss Tropp termed her relationship with her sister as a close one. She said that Harriet had been able to read at a low level and to do simple arithmetic and to print.
The State emphasized the difference in the training of practical nurses as compared to the licensing requirements for registered nurses. This difference affects the weight to be given to Miss Tropp’s testimony, but does not change the credibility and power to note and to observe reflected in her testimony.
The chief toxicologist for the Suffolk County medical examiner’s office appeared under subpoena as claimant’s witness. He testified that an autopsy routinely included analysis of vital organs to ascertain the presence of drugs, poisons, alcohol, tranquilizers and carbon monoxide. He testified to having performed these standard tests in the Tropp autopsy. When asked whether his findings were consistent with the cause of death listed in the report, he answered in the affirmative.
In further amplification of this answer he described the amount of drugs found quantitatively and qualitatively in the instant case as being a combination that invariably pointed to drug poisoning. He added that he had found 5.1% mg. of compazine in the liver, and that this was the primary basis for his decision. He added that normal values in therapeutic situations are from five to ten times below this level.
The toxicologist stated as his professional opinion that the list of drugs prescribed for Harriet Tropp in July and August of 1965 which included Librium, Equanil, Sodium Amytal, Compazine and a solution of B. ■& C, was consistent with his findings.
At the request of the Attorney-General, the court informed this witness that the questions posed to him warranted his being advised that an individual cannot be compelled against his will to testify as an expert. (See Fisch, New York Evidence, § 412.)
The chief toxicologist replied that, having been subpoenaed and asked the question, he wished to answer it in the interest of justice, and his answers were given responsively.
The court recognizes that the State is not an insurer of the safety of the inmates of its institutions for the mentally ill, and is responsible only for hazards reasonably to be foreseen and only for risks reasonably to be perceived. (See Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 344; Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40; Higgins v. State of New York, 24 A D 2d 147.)
The court further recognizes that accepted modern medical practice relies upon tranquilizing drugs as appropriate thera *817 peutic treatment for mental patients. It must then decide whether the qualitative and quantitative dosage prescribed and administered to Harriet Tropp was such a deviation from the accepted standard of medical care as to become the proximate cause of the girl’s death and thus cast the State in liability for the unfortunate event.
The court notes that Harriet Tropp was in the exclusive control of the State, that suitable treatment of such cases by the use of tranquilizers requires professional skill in the prescription by the institution’s physicians and careful administration by the attendants charged with the responsibility of carrying out the doctor’s orders.
The court accepts claimant’s expert’s opinion as to the cause of Harriet’s death, buttressed by the Medical Examiner’s report, which was signed by another doctor, now deceased, and reviewing it with the sister’s report on her observations, which, though not those of a trained, registered nurse, had been sharpened by practical nurse’s training.
The State cited Hirsh v. State of New York, (8 NY 2d 125, 127) in which the proximate cause of the death was barbiturate poisoning and the question was the source from which the self-administered drugs came to the patient which the Court of Appeals characterized as “a mystery in the record.” The instant matter differs from the Hirsh case in that here the drugs were prescribed and administered under State doctors’ orders and were found by the Medical Examiner to be the cause of death.
Though the State is not responsible for an honest error of professional judgment made by qualified and competent doctors employed by them, the evidence adduced herein preponderates on the State having erred in overdosing deceased, and in having failed to decrease the overdosage though it was observable that the dosage was excessive.
The court, though not substituting its judgment for that of professional medical opinion, finds more compelling the expert evidence produced by claimant.
Claimant’s proof that the administration of the drugs in the quantity prescribed for the deceased was the proximate cause of death was not rebutted by the State despite all the staff available to them.
Claimant also relied on the doctrine of res ipsa loquitur. The court finds that on the facts adduced the claimant was not guilty of contributory negligence. The State therefore must respond in damages for not properly meeting the responsibility of proper *818 care of the deceased. The court finds that the State was negligent in its method of treatment of the patient and that this negligence was the proximate cause of her death.
The amount of damages is difficult to determine since the deceased was a retarded young adult who never had earned her living or contributed to the support of her family. The prognosis for her recovery and ability to live and work outside an institution was guarded. Appraising the value of her life to her family, one must and does recognize that she was a daughter, probably loved and missed. It is not possible to ascertain from the evidence whether or not she experienced pain and suffering, and if she did to what degree. (See Santana v. State of New York, 28 A D 2d 576, 577.)
The administratrix paid $734 for the deceased’s funeral and $150 for the monument. The court awards $2,000 in all damages and $884 to reimburse the family for the funeral expenses and cemetery monument, a total of $2,884 together with interest thereon from August 8, 1965 to the date of entry of judgment.