PATRICIA CAMERON et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 48857.)

Fourth Department, June 25, 1971.

*Louis J. Lefkowitz*, Attorney-General (*Jeremiah Jochnowitz* and *Ruth Kessler Toch* of counsel), for appellant.

*McDonough, Boasberg, McDonough & Beltz* (*Charles J. McDonough* of counsel), for respondents.

GABRIELLI, J.  Appeal is taken from a judgment in favor of claimants resulting from an assault upon the infant claimant, based upon the alleged negligence of the State.  On August 4,

1967, claimant Patricia Cameron, aged 19, was severely injured when Dennis Buthy attacked her with a meat cleaver and butcher knife. Buthy, a former mental patient in a State hospital, had been discharged on June 20, 1967, following his last admission therein on June 15, 1967. The State has been charged with liability upon the theory that Buthy was both mentally ill and dangerous when discharged, that he should have had continued hospital care and, further, that the hospital personnel knew or should have known that he was dangerous, thus requiring them to make certain he would receive adequate follow-up care and treatment.

The Court of Claims has held that the act of the hospital in releasing Buthy could not be the basis for any liability, since it was founded on and resulted from a diagnosis and decision based on medical judgment, even if such decision proved to be erroneous by subsequent events. We agree with the court's determination in this regard.

The record shows that Buthy had been a patient of Meyer Memorial Hospital on several occasions for alcoholism and that he had been a patient at the State hospital on two prior occasions. It also shows that he was prone to commit assaults, and in the past had committed acts of violence on members of his own family.

Following an arrest for disorderly behavior and after having been discovered unconscious in the street, he was admitted to the State hospital for examination on June 15, 1967, based on a certificate made by two physicians. There followed a series of physical and psychiatric examinations and, upon his mother's request that he be released, in which Buthy concurred, a staff evaluation of the examinations was held. As a result of these examinations, Buthy was diagnosed to be " *Without mental disorder*, psychopathic personality, asocial and amoral trends " and he was ultimately discharged. (Emphasis supplied.) It cannot be disputed (and the dissenters concede) that this decision to release Buthy was a professional medical judgment.

It is urged that the claim of liability finds support in the testimony of two psychiatrists who, in substance, concluded that the doctors at the State hospital had made a " poor prognosis " and one of the claimants' experts testified that upon his release, Buthy was suffering from " schizophrenia, chronic, paranoid type with catatonic features ". It is interesting to note that Dr. Schutkeker, one of claimants' experts, had but a few weeks earlier made a similar decision to release Buthy from Meyer Memorial Hospital.

There is no claim or suggestion that the staff doctors who had Buthy in charge at the State hospital were incompetent or unqualified. Furthermore, the record is barren of any evidence characterizing the decision to release Buthy as any medical malpractice. In sum, claimants' experts basically testified that had they been faced with the responsibility of making a release decision, they would have arrived at a different conclusion.

The decision to release Buthy from the State hospital was a matter of professional medical judgment and although other physicians might not make such a judgment or reach a decision to effect the release, liability will not attach even if the honest professional judgment to release him was in fact erroneous (*Taig* v. *State of New York,* 19 A D 2d 182; *St. George* v. *State of New York,* 283 App. Div. 245, affd. 308 N. Y. 681). The diagnosis of a mental illness cannot be made with absolute precision and, of necessity, must be a matter of judgment involving a calculated risk. If we were to impose liability on the State each time one of its doctors made an erroneous prediction of the future course of a mental disease or the possible recurrence of any prior problems, few releases would be made. (*Higgins* v. *State of New York,* 24 A D 2d 147.) The basic philosophy underlying the long-established rule of freedom from liability when a decision to release a patient is founded on a professional medical judgment, is well stated in *Taig* (*supra,* p. 183) wherein the court concluded that: '' The prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk. If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated. This is one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others.''

We now turn to the theory on which the Court of Claims imposed liability. Having found that the decision to release Buthy could not be the basis for recovery, the court proceeded to hold the State liable on the theory that the authorities at the State hospital discharged Buthy without taking reasonable precautions. The court erroneously reasoned that since the hospital knew that Buthy was potentially dangerous it had a duty to determine whether Buthy's parents knew of the potential risk, a duty to determine whether the parents could exercise

supervision, and the further duty to determine whether he would receive proper medical care upon his release.

We are unable to agree with this reasoning. In our view the claimants have not carried their burden to show that the hospital omitted precautions required by proper hospital practice and to show that any alleged acts or omissions of the hospital in this respect had a causal relationship to the injuries sustained. In assessing the Court of Claims' rationale for imposing liability, we must consider the fact that the doctors found Buthy to be free of mental disorder. Upon such a finding, he was entitled to be released (Mental Hygiene Law, § 87, subd. 1, par. b). This fact must necessarily limit the duty of the hospital authorities. With this in mind we consider each of the alleged omissions.

The evidence is insufficient to support a finding of actionable negligence in the hospital's failure to make certain that Buthy would receive further psychiatric and medical care. The scant evidence concerning this charge indicates that whatever duty is imposed on a hospital is satisfied if the patient in fact receives care from a qualified psychologist or psychiatrist. It is pertinent that under similar circumstances on May 24, 1967, Meyer Memorial Hospital released Buthy to the private care of a private psychologist. On June 20, 1967 the authorities at the State hospital were advised that Buthy was to receive continued private care from a psychiatrist and a psychologist. It later developed that the psychiatrist did not accept Buthy as a patient. However, claimants failed to show what responsibility was assumed by the private psychologist. On this record we must conclude that, in fact, appropriate after-care arrangements were made consisting of private care with this psychologist. Since the testimony shows that medication after discharge is within the control, not of the releasing hospital but of the person who will thereafter assume responsibility, we must also conclude that the hospital may not be found liable for any omissions with regard to medication.

Furthermore, we perceive no actionable negligence in the alleged failure of the hospital staff to express to Buthy's father their opinions concerning the patient's release nor in their failure to verify a representation that his father would accept custody. The hospital records introduced at trial show that in fact the staff had informed Buthy's parents of his condition on several previous occasions and, of course, that they were aware of his proclivities. Even with this knowledge, his mother requested Buthy's discharge and, following the father's agreement to

pay for his support and psychiatric care, she executed a general release to the hospital. On these facts, and given the professional judgment that Buthy was without mental illness, the hospital was required to release him. We find it improbable that any further conference with Buthy's parents would have influenced the decision to release him or altered his behavior after release. Therefore, claimants have failed to establish that any omission in this regard had a factual or causal relationship to the injuries sustained. Additionally, we take note of the absence of any evidence in the record that the claimed omitted precautions were required by accepted hospital practices.

Quite apart from the matter of proximate cause, the law does not impose upon a hospital the continuing duty to exercise a parental role over discharged patients. We cannot accept the contention that because it had reason to know that Buthy's parents had not been successful in controlling his behavior, the hospital should have done something more. Under the provisions of the Mental Hygiene Law the hospital authorities were required to release Buthy, regardless of their opinion about his parents' ability to control his behavior, once they determined that his misconduct was not the result of any mental disorder or illness.

The dissenting opinion concedes that the determination that Buthy was not a '' mentally ill person '' was a matter of medical judgment. However, the dissent argues that a hospital has the authority to retain a person found to be free of mental illness if the hospital determines that the person is dangerous to himself and the community. We must observe that the claimants do not advance any such contention in their brief to this court, nor has the lower court adopted this position. Indeed, all the testimony in the record is to the contrary. Dr. Schutkeker, testifying for the claimants, stated that Buffalo State Hospital '' Obviously * * * could not keep him in '' after they diagnosed Buthy as without psychosis. He repeated this statement on at least two occasions. In fact, Dr. Schutkeker had made the same diagnosis and ordered Buthy's release from Meyer Memorial Hospital less than two months earlier, even though he believed Buthy to be '' impulsive, homicidal and dangerous ''. Dr. DiFrancesca, for the State, testified that in most cases persons having psychopathic personalities are discharged completely. He made no exception for dangerous psychopaths. There is nothing in the record to dispute Dr. Salaban's testimony that a person suffering from a character disorder will not benefit from hospitalization. In short, the record contains not one

shred of medical testimony to indicate that a hospital has the power to retain persons found dangerous but without mental illness. If such a power does exist, it is inexplicable that all medical testimony appears to be based on a contrary assumption.

An examination of the structure of the Mental Hygiene Law against the background of our jurisprudence and current medical opinion leads to the conclusion that the law does not confer upon hospitals the power to detain a person who is without mental disorder and is not mentally ill. If involuntary detention is to be authorized, we are required to find a most compelling justification and specific statutory authorization.

Against this background we could adopt the view that the law authorizes the detention of persons without mental illness only if we could find the most clear statutory direction.

The Mental Hygiene Law was drafted on the traditional assumption that only those found to be with mental disorder or mentally ill may be detained. Reference to but a few of its provisions readily reveals this basic and logical concept, viz:

Subdivision 1 of section 70 setting forth the general requirements for admissions, states that: " Any person alleged to be *mentally ill* to a degree which warrants hospitalization in a hospital * * * may be admitted to and received and retained as a patient in a hospital ". Subdivision 2 thereof provides in part that: " No mental defective or epileptic shall be received and retained in a state hospital unless such person shall be *mentally ill.*"

Subdivision 4 provides in part that: " Certificates, as required by this article, must show that the person is *mentally ill* " and subdivision 1 of section 72 provides, in pertinent part, that: " The director of a hospital may receive and retain therein as a patient any person alleged to be *mentally ill* and suitable for care and treatment ".

Subdivision 3 of section 72 thereof provides that a patient or any relative or friend, or the Mental Health Information Service may request a hearing on the question of need for hospitalization. Upon such a hearing, the court " shall render a decision in writing as to the *mental illness* and the need for retention of the patient "; and, finally,

Section 87 (subd. 1, par. b) of the Mental Hygiene Law directs that the director of a hospital may discharge any patient " who, in his opinion, is not *mentally ill.*" Conspicuously absent among the available dispositions is the power to order the retention of any patient if the court finds the patient not mentally ill. In our view, the central premise of the law is that involuntary

hospitalization may be initiated and may be continued against the person's will only if the appropriate medical authority is prepared to diagnose' the person as "mentally ill." (Emphasis supplied in each instance.)

The dissent seeks support in section 87 (subd. 1, par. b) of the Mental Hygiene Law, which uses the word "may" in the provision authorizing the hospital to discharge a person found not mentally ill. However, the person's right to release follows not only from that section but also from subdivision 3 of section 72 which makes "mental illness" the key predicate for any further detention.

The dissent takes comfort in and relies on the provisions of 14 NYCRR 37.2 and section 24 of the Mental Hygiene Law, for support of their holding that a patient may not be released if found to be dangerous. Such reliance is ill-founded.

Section 14 NYCRR 37.2 is not applicable to patients being finally "discharged" from a hospital. This section has reference to the release of patients on a convalescent or community status and, of course, who, it must be assumed, are mentally ill and subject to hospitalization. If we were to adopt the view of the dissent that this regulation permits a hospital to retain a person without mental disorder or illness, we would then be establishing preventive detention against the fundamental principles of our law and without express statutory authorization. This we refuse to do. Because the law contains no express provision that persons without mental illness may be detained, we ought not give the cited section of the rules and regulations a reading that would contradict the governing premise of the law.

The dissent's reliance on section 24 of the Mental Hygiene Law is entirely misplaced, in our view, because that section is intended to deal with liability and responsibility for care and treatment of the mentally disabled. The section has as its purpose the allocation of costs for the care as provided by the applicable provisions of the law. Were we to adopt the dissent's reasoning, we would then be led to the anomalous result that the express provisions on admissions and the patient's rights, carefully detailed in article 5, have no meaning. We believe that the controlling provisions of article 5 reveal an unmistakable intent to detain only those persons found mentally ill.

We conclude that in view of the court's correct conclusion that the decision to release Buthy was a professional medical judgment, and with an absence of any legally required post-release care upon which a finding of negligence could be predicated, the judgment should be reversed and the claim dismissed.

54

MOULE, J. (dissenting). Dennis Buthy had a long history of mental illness and antisocial behavior. When he was in fifth grade, he punched a teacher and was transferred to a disciplinary school. While in high school, he exposed himself to his sister and her girl friend. He was expelled from college for drinking and assaultive behavior.

In November, 1964 his father filed a complaint alleging that he had exposed himself to his sisters, and he was ordered by a Family Court Judge to live away from home.

In November, 1965 he was admitted to E. J. Meyer Memorial Hospital where his condition was diagnosed as alcoholism, passive aggressive personality with a homosexual component. On December 20 of that same year he was again admitted to E. J. Meyer after an attempted rape of his 21-year-old sister. He denied making a sexual assault on her but admitted hitting her and also that he had kicked women in the street without provocation.

He attacked his mother in January 1966, dragged her into a bedroom, ripped her clothes off and beat her until she was able to escape and run from the house. In March of that same year, he hit a strange girl on the street without provocation, knocking out two of her teeth, and was arrested and charged with assault in the third degree; later that month he was admitted to Buffalo State Hospital as a voluntary patient. April 26, 1966 he was released with a diagnosis indicating a severe character disorder, with the use of alcohol to facilitate the acting out of aggressive, sadistic impulses. On May 17, 1966 he was again admitted to E. J. Meyer on the order of a City Court Judge after charges had been placed alleging that he forced his 11-year-old sister to disrobe and perform fellatio on him and had torn her vagina with his finger. A report of a staff psychologist stated: "Patient himself theorizes in schizophrenic fashion that by attacking women who can give birth to life, he can symbolically kill life, in a general way that is women represent life which he wants to kill, so he strikes out at them. * * * this combined with his anger towards women generally, his lack of impulse control and his belief that by attacking women he can kill life, makes him highly dangerous." He was transferred to Buffalo State Hospital on August 2, 1966 and on August 4 a mental examination indicated he had an urge to beat up women to whom he was attracted. On August 21 he attempted to assault another patient with a knife. On September 16, 1966, one of the staff's psychiatrists informed Buthy's father that he was not mentally ill but was dangerous. Notes of a staff meet-

ing of psychiatrists held on September 23, 1966 also stated that he was dangerous.

After some correspondence about January 2, 1967, the Director of Buffalo State Hospital informed his father that he was concerned that he might commit further violent acts. However his father requested his release, and on February 7, 1967 a committee of three physicians, convened to consider his request, concluded that he should be released.

He was admitted to E. J. Meyer on May 13, 1967, discharged and again admitted on May 19, 1967. A psychiatrist there noted that he was " homicidal, dangerous, and certifiable " but he was released on May 24, 1967. The final diagnosis on his release from Meyer was that he was " impulsive, homicidal, and dangerous " but " not ' psychotic ' today ".

On June 15, 1967 he was again admitted to Buffalo State Hospital on the certificate of two doctors after he attempted to commit suicide. The certification noted, " He wants to kill himself. He hates women including his mother, admires Speck (in Chicago) and wants to imitate him." and that " The condition of this patient is such as to require treatment in hospital. He is felt to be extremely dangerous."

Buthy asked to be released on June 20, 1967 but was told that he would not be discharged unless his father signed him out. Later that same day, Buthy's mother requested that he be released in her custody and informed a staff psychiatrist that his father would pay for his support and psychiatric care. On that day also, a committee of three physicians, formed to consider his discharge, reported: " It was the consensus of opinion that this patient was not psychotic and that the treatment in the hospital was without any value since it did not represent an indication of the patient's motivation for any change. It was further the consensus of opinion of the committee that this man is a potentially dangerous psychopath who has to be handled by a firm insistence that he carry the responsibility for his acts." Buthy was released that same day.

On August 4, 1967 he lived up to his earlier threats to harm women and his prognosis of vicious propensities by brutally assaulting claimant Patricia Cameron. His conviction of assault in the first degree was reversed by this court because the People failed to prove he was sane. (*People* v. *Buthy*, 33 A D 2d 986.)

The State's position at the trial and on this appeal was that he could not be retained in the hospital because he was not mentally ill, although he was a dangerous psychopath, and he had to be released. Subdivision 8 of section 2 of the Mental Hygiene Law provides: " A ' mentally ill person ' means any

person afflicted with mental disease to such an extent that for his own welfare or the welfare of others, or of the community, he requires care and treatment ''. A psychiatrist for claimant testified that a person who was a dangerous psychopath was mentally ill. The State's psychiatrists equated mental illness with psychosis and their diagnosis was that he was not psychotic. That diagnosis, as shown by the record, was that although Buthy was without mental disorder, he had a psychopathic personality with asocial and amoral trends.

The majority would absolve the State from liability because the diagnosis that Buthy was not mentally ill was a matter of medical judgment. While the diagnosis was a medical judgment, the decision to release him was not. Without disputing whether Buthy was mentally ill, he should not have been released since it was undisputed that he was dangerous to himself and the community. His history and the report of the three psychiatrists made the day he was discharged clearly showed this. The majority places great emphasis on the psychiatrists' belief that they had to release a person who was not psychotic and would base the right of a patient to release on that narrow ground.

In the absence of a demand for a hearing, Buthy could have been retained under section 73 of the Mental Hygiene Law for a period of 60 days and, thereafter, the director could have applied for a court order directing Buthy's continued retention on the grounds that he needed further care and treatment.

Section 87 (subd. 1, par. b) of the Mental Hygiene Law provides that the hospital '' may '', not that it '' must '', discharge a patient who is not mentally ill. This provision that such a patient '' may '' be released is supplemented by 14 NYCRR 37.2. That section, established by the Commissioner of Mental Hygiene under the authority of subdivision 4 of section 12 of the Mental Hygiene Law, provides: '' No patient in any hospital or institution shall be released who in the judgment of the director or person in charge is homicidal, suicidal, destructive or dangerous either to himself or others.'' That section is not limited, as stated by the majority, to patients released on a convalescent or community status. That it applies to the release of all patients is made clear by a reading of 14 NYCRR 37.3 which provides: '' All patients who have been released from a State hospital or school are eligible to receive aftercare services. Patients placed on convalescent or community status receive aftercare privileges as a condition for such status.'' By differentiating between '' All patients '' and '' Patients placed on convalescent or community status '' it is clear that the preceding section applies to the release of all patients. Further,

patients are "placed on" convalescent or community status. Such patients are not "released".

Even if Buthy was not mentally ill, he was mentally disabled which means "a person who is mentally ill, mentally defective, epileptic or otherwise psychiatrically or neurologically disordered, and who requires care and treatment in a hospital or institution." (Mental Hygiene Law, § 2, subd. 21.)

Under subdivision 1 of section 24 of the Mental Hygiene Law, a mentally disabled person may be hospitalized if his "condition is such as to endanger his own person, or the person and property of others". That is a rather accurate description of the patient, Buthy.

The State is liable in the operation of its mental hospitals for risks reasonably to be foreseen. (*Flaherty* v. *State of New York*, 296 N. Y. 342 and *Excelsior Ins. Co. of N. Y.* v. *State of New York*, 296 N. Y. 40.) In *Scolavino* v. *State of New York* (297 N. Y. 460), the State was held liable for an assault by an inmate of a mental hospital because the risk was foreseeable and the hospital failed to take necessary precautions. In *Weihs* v. *State of New York* (267 App. Div. 233) and *Jones* v. *State of New York* (267 App. Div. 254), the State was held liable for injuries caused by escaped mental patients who were known by the hospital authorities to be dangerous.

Here, the State hospital authorities concede that their patient, Buthy, was a "potentially dangerous psychopath" with a long history of bizarre sexual and assaultive conduct who had threatened future attacks on women; yet they voluntarily discharged him into the community in violation of rules of the Department of Mental Hygiene and in spite of the fact that they had ample authority to detain him. This action was not based on a medical judgment that the patient was probably harmless but upon a mistaken and careless, if not reckless, conclusion that they were without power to hold a patient known to be dangerous. Under these circumstances, the State should be held liable for the negligent failure of its employees to utilize the State's power to protect the community, particularly the claimant, from a risk reasonably to be anticipated. (*Dunn* v. *State of New York*, 34 A D 2d 267.).

Consequently, I vote to affirm the judgment.

DEL VECCHIO, J. P., and HENRY, J., concur in opinion by GABRIELLI, J. MOULE, J., dissents and votes to affirm in opinion, in which MARSH, J., concurs.

Judgment reversed, on the law and facts, without costs and claim dismissed.