ALDO STATINI, as Administrator of the Estate of AMELIA SCHIOPPA, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 29319.)

Court of Claims, April 18, 1952.

*Abraham Rosenfeld, Harry H. Lipsig* and *Emil Reich* for claimant.

*Nathaniel L. Goldstein, Attorney-General (David Marcus* of counsel), for defendant.

SYLVESTER, J. On May 2, 1948, Joseph Schioppa, a mental patient on convalescent leave from a State hospital, killed his wife. Her administrator, suing the State for the benefit of the two infant children left her surviving, alleges that the State's negligent supervision and care of the patient caused the death and claims damages therefor.

On May 3, 1947, Schioppa had been brought to the Kings County Hospital for psychiatric observation where he was certified as mentally ill. Accordingly, on May 20, 1947, he was committed to Central Islip State Hospital for care and treatment. On August 3, 1947, he was released on convalescent leave in the custody of his wife. On October 29, 1947, after suffering a relapse, he was returned to the institution. On April 4, 1948, he was given his second convalescent release in his mother's custody. In the evening of May 2, 1948, he called at his wife's home and stabbed her to death.

Schioppa, during his first stay at Central Islip, came under the care of Dr. Yudashkin who, upon examining the patient, and taking his anamnesis and after discussions with members of his family, made a tentative diagnosis of dementia praecox, paranoid type. It appeared that, except for his mental dullness and occasional temperamental flare-ups, Schioppa's youth and early adulthood were unexceptional, there being no account of any manifestations of psychotic behavior nor of any assaultive or suicidal predisposition. However, soon after his marriage to Amelia in 1942, there developed indications of irritability and instability in his behavior, a condition which seems to have become more marked as time went on. Sometime in 1946, Schioppa suffered delusions that he and his younger child, who had congenital tuberculosis, had contracted the disease through contact with his wife. He thereafter left his wife to live with his mother and sister, where it appears that his depressed attitude of mind and his bitterness toward those around him became more noticeable. Because of these disturbances, his brother, Carmine Schioppa, took him to Kings County Hospital. It was found that the patient was suffering from a persecution complex and delusional traits, with poor insight into his condition.

Schioppa's adjustment during the first part of his stay at Central Islip Hospital was considered satisfactory. It was noted that no antisocial tendencies were present and it was determined that the application of shock treatment was deemed inadvisable in view of his apparent progressive improvement. At the end of June, 1947, his condition was sufficiently reassuring to entitle him to parole of the grounds. Parenthetically, it is observed that the family of the patient had never informed the doctors of any assaultive conduct on the part of the patient. With continued improvement, the patient expressed his willingness to return to his wife. After several talks with her husband, the wife approved; whereupon on August 3, 1947, the State psychiatrists recommended and placed Schioppa on convalescent status in his wife's custody and instructed her on matters concerning her conduct toward and observation of the patient. At that time he appeared to be completely free of any delusional traits or ideas of bitterness towards members of his family.

Upon leaving the State hospital, and while at the brother's summer home to which they had gone for the day, Schioppa unexpectedly stated that he wanted nothing further to do with his wife and that he had only used her as a tool to get out.

Accordingly, the brother took Schioppa to his mother's Brooklyn home, the wife returning to The Bronx where she lived. The wife immediately wrote to Dr. Yudashkin at Central Islip State Hospital, apprising him of the incident and of her belief that a mistake had been made in effecting her husband's release. Thereafter, the hospital, acknowledging receipt of her letter, suggested that he be brought to the aftercare clinic on August 16th and further advised that, if he became unmanageable in the meantime, to return him to Bellevue Hospital immediately. However, Schioppa continued to reside with his mother and sister, who very soon after became troubled by his apparent relapse. After a series of communications between the family and the hospital on the subject of reconfinement, his brother, in October, 1947, returned him to the Kings County Hospital. It is significant that, during this parole period, the patient's conduct was unmarked by any attempt to do violence though there were occasions when he and his wife had been together.

Schioppa had no idea of the cause of his return to Central Islip other than that his brother had advised it. A later psychiatric examination on November 10, 1947, disclosed no delusions or ideas of reference and his apparent recovery was indicated. Shock therapy was not invoked because his condition did not warrant it and because a healed pulmonary lesion militated against it. On December 1, 1947, he was found to have emotional slumping with little insight into his condition, but with no definite trends. Thereafter, he continued to improve to the extent that he was delegated to perform the duties of a messenger and given complete parole of the grounds.

His family, including his mother and sister, after visiting the hospital weekly, expressed the desire to have him home. On March 31, 1948, on reviewing the case, Doctors Moore and O'Neill, who were then charged with Schioppa's immediate care, discussed their observations and recommended convalescent status at the mother's home which had theretofore been found satisfactory after inspection. Schioppa was again released after his mother signed the necessary agreements (to which the wife assented), and the family was counseled as to the manner of the patient's care and as to the steps to be taken should he again prove difficult.

Though members of the family testified that, during the period of his second convalescent leave, the patient appeared "sick" and that his stay at home was irregular, they never communicated these facts to the hospital. On April 23, 1948, a social worker visiting the mother's home, found Schioppa

out and left a note urging him to come to the outpatient clinic on May 3, 1948. On May 2, 1948, Schioppa called at his wife's apartment in The Bronx and brutally killed her.

It is urged as improper hospital practice that the State's psychiatrists failed to affirmatively inquire of the family as to any assaultive history and criminal background of the patient; that they failed to confront the patient with the wife and sister, the objects of his ideation, prior to his second convalescent release; and that in view of the wife's letter of complaint dated August 3, 1947, though made on the occasion of the first convalescent leave, the State was thereafter on notice of his dangerous propensities and should, therefore, have denied him further convalescent status.

The record shows that the State's psychiatrists, Doctors Boigon and Yudashkin, made inquiry of members of the family regarding assaults or the use of force by the patient and that they were advised that he had made no such attempts. In any event it is established that even were assaultive conduct disclosed by a more detailed history of the patient, it would not have precluded his convalescent release in view of his improved condition which, in the opinion of the psychiatrists, warranted convalescent status.

It is claimed to be improper hospital practice to have neglected to arrange a pre-parole confrontation; that is, to have the wife and sister confront the patient to observe the patient's emotional reaction as a guide in determining the propriety or advisability of permitting convalescent release. Claimant's psychiatrists maintained that confrontation with the object of the patient's ideation should have been availed of to note the patient's reactions. On the other hand, the State's psychiatrists disputed the validity of this practice. They were of the definite opinion that confrontation, so called, was rarely employed and was not in accord with good psychiatric practice and that it was not availed of in institutions, public or private. The impressive testimony establishes that if the psychiatrist is able to determine delusions or instability on examination of the patient, there is then no need for the device. Also, where there is no evidence of emotional instability, confrontation would be of no help.

Admittedly, the convalescent status program is recognized and widely accepted as good psychiatric technique. It aims to take the patient out of the hospital which is a place of cure as distinguished from a place of confinement, and to move him into a normal environment in aid of his social adjustment.

In view of Schioppa's indicated improvement and considering all the circumstances preceding his second convalescent release, it becomes established by the substantial psychiatric testimony that the decision to permit his release was justified as a matter of good psychiatric practice.

It is concluded that the State was not negligent in the matter of obtaining Schioppa's history, or in his treatment and care; that the State's psychiatrists, in accordance with approved psychiatric practice, were fully justified in recommending his release on convalescent leave. They exercised the skill and diligence of the reasonably proficient psychiatric practitioner in the care and disposition of the patient. (*Carpenter* v. *Blake*, 75 N. Y. 12; *Pike* v. *Honsinger*, 155 N. Y. 201; *Kinsley* v. *Carravetta*, 244 App. Div. 213, affd. 273 N. Y. 559.)

In these circumstances, the resulting tragedy, horrible as it was, cannot justify the imposition of a liability against the State. Judgment is therefore directed dismissing the claim. The foregoing constitutes the written and signed decision of the court (Civ. Prac. Act, § 440).