GEORGE M. SEAVY et al., Appellants, *v.* STATE OF NEW YORK, Respondent.

Fourth Department, June 25, 1964.

*George Kohn* for appellant.

*Louis J. Lefkowitz, Attorney-General (Jeremiah Jochnowitz* and *Paxton Blair* of counsel), for respondent.

GOLDMAN, J.   A 20-year-old mentally retarded but educable young man with an I. Q. of about 60, while participating in the State's program of Working Convalescent Care, hereinafter referred to as " W. C. C.", pursuant to section 132 of the Mental Hygiene Law,[1] allegedly set fire to a barn on claimants' dairy

1. L. 1963, ch. 522, § 3, substituted the word " community " for " convalescent " throughout section 132.

farm. The barn and its contents were destroyed. In August, 1957, the claimants had entered into a placement agreement with the Rome State School, which is operated by the State Department of Mental Hygiene for the care and training of mentally retarded individuals, whereby, after having a discussion of his condition, they accepted custody of the young man as a farm worker. The fire occurred after he had worked on the farm for 11 days during which period he presented no serious behavior problem.

Claimants appeal from a judgment of the Court of Claims which dismissed after trial their claim for damages, which claim was premised on the theory that the State's agent misrepresented the character of the patient and also that the State was negligent in transferring the young man to the Rome institution. Claimants contend the State represented the boy as reliable, with a clean record, and suitable for farm employment while in fact he had a vicious temper, a record of mental disturbance at State institutions and of pyromaniacal propensities; also that the State was negligent in not transferring the boy to an institution for defective delinquents under the jurisdiction of the Department of Correction (Mental Hygiene Law, § 135).

The boy, whose mother had been an inmate of Wassaic State School, was himself admitted at the age of 10 in June, 1947 with a psychiatric classification of " Mental deficiency. Familial. Mental Status: Moron." His record at Wassaic indicated that on various occasions he had been disagreeable, sullen, obstreperous, disobedient, with a passive sex problem and yet at other times he was and could be well behaved. He had eloped three times. He suffered burns in February, 1951 after having spilled cleaning fluid on his body, intentionally, according to two fellow patients, and unintentionally according to his own account. He was discharged by transfer to Rome State School, hereinafter referred to as " Rome ", on July 19, 1956 with the remark on his record " Condition unimproved ". The transfer was made at the request of the Wassaic authorities who were experiencing trouble with a group of boys and had decided that if they were separated and moved to other institutions the situation at Wassaic could be alleviated. One of the doctors at Rome suggested to the boy that he make a fresh start and that, if he behaved himself for a year, he would be given an opportunity to be released on W. C. C. He was placed under the care of a man who had a reputation for successfully handling problem children and during his entire 13 months' stay at Rome he showed great improvement. His behavior at Rome was

termed " excellent ". In the judgment of those charged with responsibility at Rome, the young man was ready for convalescent status. The assistant director of the school, a specialist in psychiatry for 27 years, testified that it was good medical practice to transfer the boy to community care.

The trial court, from the record before us, was justified in finding that there was no misrepresentation of the history of this mentally retarded lad. Misrepresentation is any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts (7 Encyc. New York Law, Contracts, § 2101, p. 477 *et seq.*; Black's Law Dictionary [4th ed.], p. 1152). No specific representation was made by anyone that the boy would present no problem. On the contrary, one of the claimants testified that the social worker at Rome, one Olin, told claimants that *if* (emphasis ours) the young man made good at the Seavy home, he would be released within a year. One of the reasons for his transfer from Wassaic, where his record indicated adjustment problems, to Rome, was to obtain vocational training. The record further indicates that the guidance and training at Rome was very beneficial. Based upon his excellent behavior record, he was recommended for W. C. C. He was doing well at his farm job for 10 days when, for some unknown reason, it is claimed he set fire to the barn.[2]

The boy's history is devoid of pyromaniacal tendencies. The one incident in the record where he was said to have been discovered at Wassaic with burns on his body, was at least ambiguous and certainly not definitive of any tendency to arson. A pyromaniac does not have an inclination to self-destruction by fire. Pyromania has been defined as an uncontrollable passion or mania for house-burning (29 Am. Jur., Insane Persons, § 3, p. 142) and as an irresistible impulse to burn or set fire to things (Black's Law Dictionary [4th ed.], p. 935).

As for the communications between Olin, the social worker at Rome, and the claimants, there is conflicting testimony as to the nature of the discussion concerning the young man's character. Both the claimant, George Seavy, and the social worker, Olin, were contradicted by other testimony. Accordingly, an issue of credibility arose. Although the testimony is

---

2. The record contains at best inconclusive proof that the patient actually was guilty of setting fire to the barn. He was held for the Grand Jury of Oneida County which after hearing the People's witnesses failed to indict him for the crime of arson. The State does not, however, contest the claimants' contention that the patient was responsible for the fire and therefore this very important question is not at issue.

conflicting in various respects there is no doubt as to the correctness of the court's finding that the claimants were aware of the boy's retardation and there is evidence to support the finding that the claimants were informed of his presence as a patient at Wassaic and of his quick temper and disagreeable behavior at Wassaic. However, it had been medically established at Rome after 13 months of observation that the young man was suitable and qualified for W. C. C. This was a judgment made by experts whose competence has not been challenged and who were well qualified to make such a determination. That judgment having been made, the institution's representative was under no duty to disclose the details of the entire past history of the lad unless there was some deficiency which could foreseeably lead to particular misconduct. It should be noted that the misbehavior pattern of Wassaic was absent at Rome and on the farm. His relationship with those on the farm was good and he apparently continued his progress which was evident at Rome. The arson incident was unrelated to any previous behavior pattern and was unforeseeable. Under such circumstances, the State is not liable (*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40).

The Rome School was under no duty voluntarily to disclose the boy's unhappy record at Wassaic, once the authorities determined from his record at Rome that he had made a good recovery and was, in their judgment, qualified for W. C. C. as a part of his rehabilitative treatment. True, there was a duty not to misrepresent and the Trial Judge, supported by sufficient proof to that effect, found there was no misrepresentation. Full disclosure of the details of past history of all patients would defeat the very purpose of the convalescent care program because the early history of all feeble-minded or morons would reveal that most of these unfortunate people have unattractive records, in many instances because of the impact of institutional environment which the open-door policy is attempting to avoid. The salutary effect of participation in community living would be denied in too many instances and these people would never be given an opportunity to lead purposeful lives merely because of a past history from which they could not extricate themselves.

Rome made a reasonably valid judgment concerning the propensities of the boy and his adaptability to community living. He was neither a criminal nor insane and the State was under no obligation to keep him under constant surveillance. Unless the State is to be made the insurer against all loss resulting from the actions of the mentally retarded, claimants

are not entitled to recover, even though there be an honest mistake of professional judgment (*St. George* v. *State of New York,* 283 App. Div. 245, affd. 308 N. Y. 681; *Taig* v. *State of New York,* 19 A D 2d 182) which, in our opinion, did not occur in the case at bar.

It is argued that it is inconceivable that claimants would have taken custody of the boy if they had known the truth. Yet there was nothing to disclose which would have indicated a tendency to arson. No facts were withheld or misrepresented for the simple reason that the record of the boy did not demonstrate a proclivity toward arson. It cannot be challenged that claimants knew they were hiring (incidentally at wages far below the going rate for farm hands) a mentally retarded young man. The placement agreement is ample proof of this. It is also said that the promise of employment, if he showed improvement at Rome, prompted a plot or scheme in the boy's mind to behave merely long enough (in this case 13 months) to achieve release. Bearing in mind that this lad had an I. Q. of 56 to 64, surely this is attributing a degree of intelligence and calculating thinking to one mentally incapable of such an exercise. This court should not substitute its view of the possible effect of good medical practice in the treatment of the mentally retarded for that of those experienced in this highly specialized area.

My dissenting colleagues emphasize the young man's record at Wassaic but seem to give no consideration to the fact that at Rome he had risen above his prior history, made a good adjustment and proved himself capable of better things under proper environment and guidance. To say that he never should have been sent to Rome flies in the face of his excellent record there. The language of the placement agreement is relied on by the dissenters who urge that the facts were sadly lacking although the agreement stated "after having been informed of his condition". This language did not necessitate complete and detailed revelation as to the boy's history. The claimants were informed the boy was mentally retarded and had been a patient with a quick temper and disagreeable tendencies at Wassaic. Again, full disclosure would have probably prevented this effort at rehabilitation. This is not to say that if there had been a record of proclivity to arson, such a tendency should not have been disclosed even if it foreclosed community status. However, it must be left to sound medical judgment whether a person is suitable for community living and to the social worker or other agent as to precisely how much need be disclosed to the

prospective employer, so long as there is no actual deception or false reply to reasonable inquiry.

A balance must be struck between the conflicting rights of a party seeking compensation for damage arising out of the acts of a mentally retarded person and the right of the patient to participate in a medically sound program of rehabilitation. A survey of progress in the field of psychiatry in the 1950's and early 1960's reveals a virtual revolution in the application of principles of psychiatry. The use of the open-door policy in psychiatric hospitals has been widely accepted. Most spectacular developments have occurred during the last two decades in the area of rehabilitation where attempts have been made to return the mentally deficient to full participation in community activity. (Textbook of Psychiatry, Ewalt and Farnsworth [1963], pp. 360–363.) Further support for the State is found in the excellent report made to Governor Dewey of a " study of release procedures for mental patients ". Governor Dewey's comment on this study found in the Public Papers of Gov. Dewey (1954, p. 832) is an excellent summary of our position in the disposition of this action: " In a matter as vital as the restoration of the mentally ill, we must not be stampeded into unwise action by hysteria engendered by occasional, widely-publicized acts of violence. As the report points out, the matter is primarily a medical one and our basic consideration must be respect for human dignity and the rights of the individual."

The law in this field, if meaningful, must not be divorced from good medical practice. Too often the criticism is made that the Legislature lags in its reflection of the needs of both individual and community. Legislative progress has been made in the case of mental hygiene. The Legislature having discharged its responsibility by the passage of laws favoring rehabilitation of the mentally ill, in accordance with sound medical knowledge and practice, the courts too have an equal responsibility to support that legislative policy so beneficial to these unfortunate people. We should not be obstructed and frustrated by an unfortunate incident as in the case at bar.

WILLIAMS, P. J. (dissenting). In our opinion an award should have been made to the claimants. We believe that, at the very least, the determination of the Court of Claims Judge was against the weight of the evidence. The claimants' versions of their conferences with Olin, the psychiatric social worker who represented the Rome State School, were more convincing and believable than that of Olin. It is inconceivable that, had

the Seavys known the truth about Cook, whom they employed, they would have taken him into their home to work upon their farm.

However, we would go further and hold that the record discloses that an award should have been made as a matter of law. From the testimony of the State's witness Olin, who knew the history of Cook, technically called "the patient", it is obvious that in his conferences with the claimants he was less than candid and forthright in stating the character and past history of this mentally retarded young man whom he placed with them. Olin said that he told Mr. Seavy that the boy had been in his school for a little over a year and had a very good record, that he had always been polite and had done his work well, and that all of the staff said he was a good prospect and wanted to work. He did not tell him that the patient had been promised that if he behaved for a year he would be put out for employment and that therefore he had a definite reason cunningly to try to convince the Rome school authorities that his character had changed. Furthermore, he did not tell claimants that only one year earlier the authorities of the Wassaic State School, where for nine years he had a very bad record, had asked for his transfer not because they had determined that he was ready for vocational training but because they were having trouble with a group of boys, including Cook, and it was decided that if they separated them and moved them into various institutions it would alleviate the situation at Wassaic. The boy probably should not have been sent to Rome for rehabilitation, but we make no particular point of this except as it concerns his entire background.

When Olin was questioned as to whether he disclosed the details of Cook's bad conduct at Wassaic, he tried to take refuge in subdivision 9 of section 34 of the Mental Hygiene Law, saying that the records were confidential. But there was nothing which prevented him from saying that the boy had a very bad record before being transferred to Rome. In fact, he testified that he told claimants generally of Cook's record at Wassaic but when pressed to state what facts he had disclosed to them, his reply was merely "that the boy had a quick temper and was disagreeable at Wassaic".

The clinical summary of the so-called patient, prepared on his leaving Wassaic, shows that Cook was something more than a mentally retarded boy with a quick temper and a disagreeable disposition. He was a mental defective unable to adjust "at school or at home"; he was unco-operative, seclusive, disoriented in all spheres; he lacked insight and judgment; he

was sullen, dull and apathetic, a familial moron with "behavior disorders"; he had frequently displayed quick temper, was resentful of correction, mischievous, sneaky; "he developed into a serious behavior problem, slapping and kicking other patients and was discovered, together with two other patients, planning to jump an attendant * * * he was found to be very sullen, impudent, antagonistic and a sex problem"; on at least one occasion he had thrown a cup at another patient, which struck the other patient's eye; "he was active in disrupting the morale of other patients and causing a disturbance in the dining room"; he had escaped (technically called "elopement") from the institution on three occasions; he had used obscene and threatening language to the employees and physicians; he had "frequently [been] involved in misconduct and mischief in the building"; he was defiant and verbally threatening when interviewed and cursed the Director and Clinical Director in front of other patients; he displayed sexual abnormalities; on discharge his behavior disorders were described as "unruly, cruel, emotionally unstable, inadequate, untidy"; and finally after he had been in Wassaic for about nine years the record recites, "Condition on Discharge: Unimproved".

The majority of this court finds that there was nothing in this boy's history to indicate a propensity toward arson. The Seavys, however, were entitled to know whether there was anything in his history to indicate a dangerous inclination to do harm to himself or others or to the property with which he would be working. Surely they were entitled to a fair statement or analysis of the boy's bad character and his unfavorable and, we may say, dangerous disposition before they accepted him as an employee. His conduct upon his release after 10 years of institutional care amply confirms the propensities which are suggested by his history and shows that his character had not changed but that he was simply trying to be released from Rome. He admitted that 10 days after his employment by the Seavys he set the fire which destroyed their barn and farm equipment. He ran away from the Seavys five days after the fire. A week later he was placed on another farm from which he also ran away, stealing $72. In the month following he was arrested for burglarizing a gas station, and he was eventually sentenced to the Institution for Defective Delinquents at Napanoch.

However, if proof is needed of an incendiary disposition, the records of Wassaic disclose it. Olin admitted that these records showed that the patient was found with first- and second-degree burns on his body, extending from both axillas down and on

both arms and on the front of his neck; that he had thrown cleaning fluid over his body. According to the statements of other patients he had done so intentionally, but according to the patient's own statements, unintentionally. It cannot be stated unequivocally from the record that after he had thrown this fluid upon his body he had not caused it to burn, so while this may or may not have demonstrated tendencies toward incendiarism, it would at least be important for a 66-year-old dairy farmer who was going to employ this patient to work in the barns of his dairy farm to know about the incident. It may well be that because of the highly flammable conditions in a dairy barn the knowledge of this episode alone would have caused the claimants to reject him.

In the prevailing opinion it is recognized that full disclosure would probably have prevented this effort at rehabilitation. If this was the case, and we agree on this point, then the school authorities had all the greater obligation to warn the prospective employers of the nature of the risk they were undertaking. They were entitled to at least as much consideration as was the boy, Cook. Advantage should not have been taken of them by misrepresentation, deception and by the failure to convey to them very material and vital information so that they might fairly make their own determination on fully presented statements of the character of Cook and his suitability for dairy-farm work.

It is very significant that before Cook was accepted by claimants, George Seavy signed an "Agreement regarding patient discharged or placed on convalescent care" with the Rome State School. The agreement commences: "In accepting custody of Donald Cook on Working Convalescent Care, *after having been informed of his condition,* I agree to the following:" (italics supplied). Here follows the agreement of Seavy to join with the Rome State School in an effort to rehabilitate the patient. In other words, the effect of this agreement was that Seavy and the State embarked in a joint enterprise in an effort to rehabilitate. Their position was akin to that of persons about to enter into a partnership or a joint enterprise, and each was entitled to the utmost good faith on the part of the other. That, of course, would call for a quite complete disclosure of any fact that might in any way influence the execution of the mutual agreement or afford either party an opportunity to determine whether or not to enter into it. This was practically, if not truly, a fiduciary relationship which called for trust and confidence and the highest degree of candor.

We are in complete agreement with the social philosophy covering rehabilitative placements expressed in *Excelsior Ins. Co. of N. Y.* v. *State of New York* (296 N. Y. 40, 46). We believe that efforts at rehabilitation are highly commendable. We must not overlook the fact, however, that a program of rehabilitation of this type is an undertaking which calls for co-operation by both parties to the transaction. Efforts toward rehabilitation, laudable though they may be, should not be at the sole expense of innocent victims such as the claimants.

Our dissent is not based upon any failure or inaccuracy of professional judgment as to whether this boy was ready for placement. It has been held very definitely that liability may not be based on honest mistakes of the judgment of experts. (*Excelsior Ins. Co. of N. Y.* v. *State of New York, supra*; *Taig* v. *State of New York,* 19 A D 2d 182; *St. George* v. *State of New York,* 283 App. Div. 245.) The cases just cited are easily distinguishable on their facts from the present case because they were escape or so-called elopement cases and there was no communication, of course, between representatives of the State and the persons who were injured by the escapees. The basis of our dissent is not in the negligent classification on placement (although there is ample evidence of that), but in the breach of a duty to fairly communicate any facts concerning the condition and past history of the patient that might reflect upon or be determinative of his then character and the prospective employer's decision to accept him and join in the rehabilitative efforts. In other words, to use the State's own language, claimants were entitled to be " informed of his condition ", which should call for complete candor one to the other. Before a relationship of employment could fairly be established, the employer should have been permitted to make his own independent determination as to whether he wanted to accept a patient of this character and disposition.

We would reverse the judgment appealed from and grant judgment in favor of the claimants for the amount of their loss.

HENRY and NOONAN, JJ., concur with GOLDMAN, J.; WILLIAMS, P. J., dissents and votes to reverse and award judgment in favor of claimants in the sum of $9,776, with costs to claimants, in opinion in which BASTOW, J., concurs.

Judgment affirmed, without costs of this appeal to either party.