OPINION OF THE COURT

Per Curiam.

Judgment entered October 13,1982 is reversed, with $30 costs, and a new trial ordered.
Plaintiff has pleaded essentially two causes of action against the defendants, one asserting general medical malpractice, including malpractice in treatment, the other, malpractice based upon defendants’ failure to secure plaintiff’s informed consent to therapy. The jury found in favor of the defendants on the former cause of action and in favor of the plaintiff — in the sum of $200,000 — on the latter cause of action.
On October 16, 1974, plaintiff sought treatment at the skin and cancer clinic of defendant New York University (N.Y.U.) Medical Center, for a condition previously diagnosed elsewhere as progenital herpes. Defendant Dr. Alexander Fondak, a resident at N.Y.U. Medical Center, treated the plaintiff on October 16, 1974. He informed the plaintiff of various “modes of therapy” for herpes, gave the plaintiff topical salve, and advised plaintiff to return to the clinic in a week, or sooner if there was a flare-up of blistering associated with the condition. Plaintiff returned to the clinic two days later, on October 18, 1974. At that time Fondak treated the plaintiff’s herpes condition with an application of dye (proflavin), subjected to a 10-minute exposure of florescent light. On a subsequent visit by plaintiff to the clinic, Dr. Fondak gave the plaintiff a nonrenewable prescription for one ounce of proflavin dye, which he was to apply “once daily” and subject to florescent light. There was testimony that plaintiff was told to apply the dye only when there was a flare-up of the blistering condition. Although plaintiff was told to phone in three days and to return to the clinic in 10 days, he did neither. Plaintiff testified that on 75 occasions, from November, *915 1974 through January, 1975, he utilized the “dye-light” treatment for his herpes condition. In February, 1975, the plaintiff read an article in Time magazine (published Feb. 3, 1975) which indicated that while the dye-light treatment had, as early as 1971, been found effective in the treatment of herpes, a recent “medical letter” had noted that “in tests on hamster cells, the dyes apparently caused changes in the viruses that enabled them to transform normal cells into malignant ones.”
In April, 1975, plaintiff commenced this action to recover damages for psychic trauma, mental anguish and torture caused by (1) defendants’ malpractice in providing the dye-light treatment, and (2) malpractice in failing to inform the plaintiff of the “danger and the risk of cancer.” It is not claimed that the plaintiff has cancer; rather, plaintiff contends that as a result of the dye-light treatment he has developed a phobia that he will contract cancer, and it is for that alleged phobia that plaintiff now seeks to recover damages (Ferrara v Galluchio, 5 NY2d 16; Trapp v Metz, 28 NY2d 913).
Plaintiff’s witnesses included the plaintiff himself; Dr. Rapp, a virologist; Dr. Savitsky, a psychiatrist; Dr. Reisch, a dermatologist; and Mr. Daniels, a friend and “counselor” to the plaintiff. The plaintiff also introduced into evidence, over repeated objections from the defendants, five articles* and an unredacted hospital record. The defendants’ case consisted of testimony by Dr. Fine, a resident of the Medical Center (who had one telephone conversation with the plaintiff, on Feb. 6, 1975 after the latter had read the Feb. 3,1975 Time magazine article); Dr. Fondak, the individual defendant; Dr. Shupack, Chief of the Skin and Cancer Unit at the Medical Center; and Dr. Spigland, Chief of the Division of Clinical Virology at Montefiore Hospital.
It was research by Dr. Rapp that had apparently given rise to the February 3, 1975 Time magazine article that had triggered plaintiff’s concern regarding the dye-light *916 therapy. Dr. Rapp acknowledged that dye-light therapy was widely used in October, 1974 for the treatment of herpes virus. He noted that experiments which he performed prior to the publication of a 1973 article on the subject showed that while dye and light treatment “inhibited” the herpes virus, i.e., their replication cycle was rendered “inactive”, the inhibited virus nonetheless retains sufficient genetic information for “cell transformation.” Both Dr. Rapp and Dr. Reisch indicated that the dye and light treatment for herpes received by the plaintiff exposed plaintiff to an increased risk of cancer and that defendants should have advised plaintiff of that increased risk at the time of treatment. Dr. Spigland and Dr. Shupack, testifying for the defendants, stated that dye and light treatment for herpes was in common use in 1974 and posed no increased risk of cancer. Indeed, Dr. Spigland noted that the therapy was “consistent with good and accepted medical practice”, could be used without the need of informing the plaintiff of any risks, because “there weren’t any risks” and its use was “almost universal” in the United States at that time; Dr. Shupack observed that the dye and light treatment for herpes received by the plaintiff was a “wholly benign form of therapy.” It was clear from defendant Fondak’s testimony that he could not have informed the plaintiff of any risks associated with dye-light treatment because, quite simply, he didn’t know of any risks.
Plaintiff’s case sought to convince the jury (1) that the dye-light therapy administered to the plaintiff by the defendant posed an increased risk of cancer, (2) that the risk was known to the medical profession in October, 1974, (2) that Dr. Fondak’s admitted ignorance of that risk constituted general medical malpractice and (4) that in view of the known risk posed by dye-light therapy, the defendants were obligated to secure plaintiff’s informed consent before initiating that treatment. Defendants, through their expert witnesses, sought to demonstrate that no increased risk of cancer was posed by dye-light therapy and, as an obvious corollary of that proposition, that defendants had no obligation to inform plaintiff, prior to administering dye-light therapy, of such a risk.
*917 In the context of this vigorously contested “battle of experts” the five articles offered into evidence by the plaintiff and accepted into evidence by the court, over defendants’ objection, assume significant importance. The five articles, some being extremely technical in nature, clearly represent hearsay evidence. No proper foundation for admitting these articles into evidence was laid by the plaintiff. Although plaintiff, in his brief on appeal, now states that the articles “were not offered to prove the truth of the statements contained therein” the record gives quite the opposite impression and the jury was not instructed that they were to in any sense limit the scope of their consideration of those articles. In this context the jury was permitted to view the articles as proof of the facts contained therein, a patent error, highly prejudicial to the defendants (Richardson, Evidence [10th ed], §§ 200, 373; and see Rosario v New York City Health & Hosps. Corp., 87 AD2d 211; Ciaccio v Housman, 97 Misc 2d 367; De Falco v Long Is. Coll. Hosp., 90 Misc 2d 164).
It was also error to admit into evidence an entry made in the hospital record by Dr. Fine after his February 6, 1975 telephone conversation with the plaintiff. In that entry Dr. Fine stated, inter alia, “I explained to him [plaintiff] that there was a great deal of difference of opinion in the cancer causing ability of the drug [proflavin] he was using.” That statement, representing a gratuitous opinion concerning a material factual issue in this case, should not have been permitted into evidence, for it was not part of any diagnosis of plaintiff’s condition, nor was it necessary for the plaintiff’s admission to or treatment in the hospital (Boucheron v Tilley, 87 AD2d 983). Dr. Fine’s entry was not binding on any theory of agency on either the defendant Fondak or the hospital (Jones v State of New York, 93 Misc 2d 916; Spett v President Monroe Bldg. & Mfg. Corp., 19 NY2d 203, 206; and see Richardson, Evidence [10th ed], §§ 301, 302).
It was error for the court to allow Mr. Daniels, plaintiff’s friend and “counselor” to testify as to the cause of plaintiff’s fear of contracting cancer and to the permanence of that anxiety. While the qualification of an expert generally falls within the ambit of judicial discretion *918 (Richardson, Evidence [10th ed], §§ 361, 364, 368, 371, 372), Mr. Daniels manifestly lacked qualifications for providing probative testimony as to the source of the plaintiff’s alleged phobia and the permanence of that condition (Matter of Miller v National Cabinet Co., 8 NY2d 277, 283). It was also error for the court to charge that Dr. Fondak’s failure to produce at trial a research report he had written could give rise to the “strongest inferences against him on that issue that the evidence permits.” Plaintiff conspicuously failed to show that the article written by Dr. Fondak bore even the slightest relevance to the issues in this case (see Richardson, Evidence [10th ed], § 92; PJI 1:77 [contents must relate materially to an issue in the case]).
Finally, we perceive an inconsistency in the jury’s verdict, on the one hand, favorable to the defendant on the general malpractice cause of action, and, on the other, unfavorable to the defendant on the malpractice cause of action based on a failure to secure informed consent. As observed in Pike v Honsinger (155 NY 201, 209-210): “The law relating to malpractice is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery * * * The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been.”
A finding by the jury that the dye-light therapy given to the defendant for his herpes condition was a medically *919 acceptable form of therapy (i.e., did not constitute malpractice) does not resolve the issue of whether Dr. Fondak’s admitted ignorance of alleged carcinogenic risks associated with that therapy — as distinguished from the treatment itself — constituted general malpractice. Those separate issues, (1) whether the therapy given constituted general malpractice and (2) whether Dr. Fondak’s ignorance of allegedly foreseeable risks associated with the therapy constituted general malpractice, should ideally be among elements of a special verdict, together with the issue of whether there was malpractice based upon a failure to secure informed consent to the therapy.
As to the concept of malpractice based on informed consent, it is best understood in reading the definitions and limitations expressed in section 2805-d of the Public Health Law, a statute which, although effective July 1, 1975 after the alleged failure to inform took place here, nevertheless “represent^] the trend of current thought” (Murriello v Crapotta, 51 AD2d 381, 384). Subdivision 1 of section 2805-d of the Public Health Law provides: “Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.” (Emphasis added.)
The case at bar is not one in which a physician knew of a reasonably foreseeable risk of treatment and failed to inform his patient of that risk. Rather, as previously noted, Dr. Fondak testified unequivocally that he knew of no risks associated with the dye-light therapy given the plaintiff. Thus, Dr. Fondak, irrespective of what he “should” have advised the plaintiff, obviously could not have informed the plaintiff of a risk from dye-light therapy of which he, himself, was ignorant. Yet, if the risk of cancer from the dye-light therapy given the plaintiff was indeed “reasonably foreseeable” — a finding subsumed in the jury’s determination that the defendants failed to secure plaintiff’s informed consent to the dye-light therapy — then Dr. Fondak’s admitted ignorance of that “reasonably *920 foreseeable risk” constitutes general malpractice within the parameters set forth in Pike v Honsinger (supra).
The converse is also true. In Waltz and Scheuneman, Informed Consent to Therapy (64 Nw U L Rev 628, 631), the authors observe: “When a risk is known to some part of the profession but not to the treating physician, the question is whether he should be legally held to a standard of equal knowledge. Here, familiar notions of a physician’s duty provide a relatively easy solution. A physician is duty-bound to have the knowledge of a reasonably well-trained and knowledgeable physician practicing under like circumstances. If his knowledge of collateral risks does not meet this standard, liability will be based on that shortcoming, not on failure to disclose. Although the distinction as to [the] source of liability is usually unimportant, it becomes crucial if the physician was not required to know of a risk, and was therefore not required to make disclosure.”
In finding in favor of the defendant on the plaintiff’s general malpractice cause of action, the jury, to our view, necessarily concluded that the dye-light therapy was a medicalfy acceptable form of therapy and either that dye-light therapy posed no risk of cancer or that even if such a risk was known to exist among some physicians, the defendants should not be held to a standard of equal knowledge. Since it follows from those findings that the defendants were not required to know that dye-light therapy posed a risk of cancer, a finding in favor of plaintiff on the cause of action for malpractice based upon failure to provide informed consent — i.e., that the defendants were obligated to disclose to the plaintiff that dye-light therapy posed a risk of cancer — is inconsistent with the jury’s exoneration of the defendants on the malpractice cause of action. More simply put, a physician cannot logically be held obligated to inform a patient of that which he, himself, is not obligated to know.
Because of the errors at trial previously alluded to and the inconsistent character of the jury’s verdict, we reverse the judgment appealed from and order a new trial.
Dudley, P. J., Hughes and Parness, JJ., concur.

 Rapp, et al., Transformation of mammalian cells by DNA-containing viruses following photodynamic inactivation, 55 Virology 339-346 (1973); Photoinactivation of herpes virus may be clinically hazardous, Medical News, J.A.M.A., July 30, 1973, vol 335, No. 5; Virologists debate new therapy: herpes cure or carcinogen?, Medical World News, Feb. 22, 1974, pp 54-55; Medical Letter, vol 16, No. 26, Issue 416, Dec. 20, 1974; Herpes hazard, Time magazine, Feb. 3, 1975, p 61.