**William O'SHEA, Individually and as Executor of the Estate of Marion O'Shea, Deceased, Plaintiff,**

**v.**

**The UNITED STATES of America, Defendant.**

**No. CV 83–3527.**

United States District Court, E.D. New York.

Dec. 2, 1985.

Pegalis & Wachsman, Great Neck, N.Y., for plaintiff.

Raymond J. Dearie, U.S. Atty. by Thomas P. Battistoni, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

381

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff William O'Shea, on behalf of himself and as the executor of the estate of Marion O'Shea, commenced this action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2402, for negligence, medical malpractice, and wrongful death.

Plaintiff alleges that the Veterans Administration Medical Center in Northport, New York ("Northport") acted negligently when its employees failed to admit plaintiff's son John O'Shea on August 5, 1980. Plaintiff further alleges that this negligent act was the proximate cause of a murder and assault that occurred three days later when John attacked his parents with a hammer, killing his mother. The United States has moved for summary judgment. Fed.R.Civ.P. 56(b).

## FACTS

John O'Shea, the son of William and Marion O'Shea and brother of Michael O'Shea, was born in 1944 entered the armed forces in 1966, and received a medical/honorable discharge in 1968. He married in 1970 but became separated from his wife in February 1973 and went to live with his parents. He stopped working as a computer operator at about the same time and has not been employed since.

On May 7, 1973, John was admitted to Beth Israel Hospital in New York City, claiming auditory hallucinations. After being placed in seclusion for the first twenty four hours of hospitalization because of hostility to the staff, he remained an in-patient with a diagnosis of acute paranoid schizophrenia until he was discharged on June 27, 1973.

Five years later, John was involuntarily admitted to Queens General Hospital and later to Creedmoor Psychiatric Center. He had barricaded himself in his room at his

parents' home and he carried a hammer because of his fears for his safety.[1]

On approximately July 6, 1978, John was transferred to Northport as an in-patient, where he remained for approximately a year, after which he was treated as an out-patient at the Lynbrook Satellite Clinic ("Lynbrook") of Northport until the date of the incident giving rise to this lawsuit. During his time as a patient of the VA at Northport and also when he was treated at Lynbrook, doctors prescribed a variety of medications for John. The dosages were lowered and in August 1979 medication was later discontinued entirely in an effort to establish a drug-free therapy. Drug therapy was promptly re-prescribed, however, when his condition worsened.

During his time as an out-patient at Lynbrook in the second half of 1979, John was evaluated monthly by a VA psychiatrist, Dr. Mocenigo, and continued to receive his medication. The periodic evaluations revealed that John's condition was basically stable. He was still living at home with his parents, taking his medication, relaxed, and apparently getting along with family and friends. At no time during his treatment as an out-patient did John exhibit any violent behavior and he was never considered dangerous to himself and others.

After the coming of the new year, however, John's behavior began to change. He began to talk less frequently with his family, he stopped eating with them, he spent more time alone in his room, and he began to lose weight. Dr. Mocenigo increased the dosages, although John's condition continued to worsen, perhaps, as Dr. Mocenigo suspected, because John was not taking his medication. The doctor therefore administered an intramuscular injection instead of oral dosages, but later reverted to oral administration of the drugs. In late spring and early summer John's condition deteriorated further. He continued to lose weight. He ate sparingly in his room, where he spent most of his time, and rarely, if ever, communicated with his family. In July, Dr. Mocenigo changed the drug therapy to a more potent drug, but he did not prescribe intramuscular injections.

In July or early August, John disappeared from home, taking $3000 and the family car. On August 4, he was found in Albany, New York where he had been living in the car for about a day and a half. He was taken into police custody and sent to Samaritan Hospital in Troy. John's family was contacted and his mother Marion and brother Michael went to Troy on August 5. An admission note, which was completed by a Dr. Armentano of Samaritan Hospital and given to Marion and Michael when John was discharged, summarized the highlights of John's psychiatric condition. It noted that John had not taken his medication in several weeks and concluded that John "was amenable to returning" to Long Island with his family. In Dr. Armentano's view, John "appeared to give tacit approval to being transported" to Northport. Dr. Armentano also stated that "the evaluation on the evening of admission revealed that the patient did not present any danger to himself or others." Defendant's Memorandum of Law, Exhibit E. On this basis John was discharged into the custody of his family.

With Michael driving and John beside him, the O'Sheas went directly to Northport, where John presented himself for voluntary admission. During the day of August 5 plaintiff William O'Shea, John's father, had attempted to secure admission for his son at Northport. William was told, either by a Mrs. Sarah Velez, Northport's admitting supervisor, or a Mrs. Miller of Congressman's Wolf's office, that admission at Northport was on a first-come, first-served basis depending on the severity of the patient's condition. William was also informed that in order for John to be transferred from Samaritan Hospital to North-

---

1. Specifically, on June 27, 1978, John carried a bar and hammer at home in order to protect himself and he agitated, hostile, and finally had to be committed because he had become violent and unmanageable. It is unclear from the record how often John carried a hammer at home. The record also indicates that John brandished a knife on an aunt during December of 1977.

port, it would be necessary for a physician or social worker at Samaritan Hospital in Albany to submit a medical report to Dr. Derman, Northport's chief of psychiatry before John could be admitted there. It is not clear from the record and the parties dispute whether Michael or Marion knew of these admission procedures when they arrived at Northport in the early evening. Although Michael spoke with his father during the course of the drive back to Long Island, Michael was apparently unaware of any potential admissions difficulties at Northport and expected that John would be admitted when they arrived there.

At the time the O'Shea's arrived at Northport, all beds in the psychiatric wards of the hospital were filled, and hospital policy dictated that only patients in an emergency condition (i.e., those presenting a danger to themselves or others) could be admitted. The hospital could admit these patients on an emergency basis and for their safety during the night, they would be placed in another ward or area until the following morning when these emergency patients could be transferred to psychiatric wards after morning discharges created vacancies. If a patient did not present an emergency situation (i.e., the patient did not present an immediate danger to himself or others) then a patient seeking voluntary admission would be asked to report the following day for evaluation for admission when morning discharges created openings in the psychiatric wards.

After a member of the Northport nursing staff took a medical history, John was examined by a Dr. Manzano. Before Dr. Manzano began the examination, he reviewed John O'Shea's entire medical file. From this file, Dr. Manzano learned that John had been treated for paranoid schizophrenia at Northport in 1978, and at Lynbrook until the present time, and that John had been prescribed medication since the initial hospitalization at Northport. The medical file did not show any history or inclination towards violence, any threats or menacing conduct, or any attempt to hurt himself or others. Dr. Manzano was aware, however, of the events that led to John's initial admission in Northport in 1978, namely that he had carried a hammer at home in 1978 and had brandished a knife in 1977. Dr. Manzano also read the Samaritan Hospital admission note, which had been given to the Northport staff when the O'Shea's arrived there from Troy. Therefore, Dr. Manzano was aware that John had not taken his medication in several weeks, that John had tacitly agreed to return to Northport for voluntary admission, and that John had been discharged into the custody of his family for that purpose. Dr. Manzano was also aware of the circumstances leading to John's admission at Samaritan Hospital and of Dr. Armentano's conclusion that John did not present any danger to himself or others. After a review of the Northport medical records, the Samaritan Hospital admission note, and the history complied by the Northport nursing staff, Dr. Manzano examined John for approximately thirty minutes. During the interview, John was polite, cooperative, and unemotional; he made no threats and showed no inclination toward violence. In a medical record made at 9:45 that evening, Dr. Mazano indicated: "pt. (patient) stated 'I am psychologically disturbed;' affect flat; verbally underproductive; poverty of thought; denies hearing voices; homicidal or suicidal ideation not elicited; quiet; he wants admission." Defendant's Memorandum of Law, Exhibit F. Dr. Manzano's notes also contain his recommendations that: 1) John return the following morning for admission; 2) John should take medication that evening; and 3) John be released to the custody of his brother. *Id.*

At the conclusion of the evaluation, Dr. Manzano spoke briefly with Michael O'Shea, and told Michael that John would not be admitted to Northport that evening, but if John returned the following morning, "you will have no difficulty getting him in tomorrow at the normal admitting time at 8:00." Deposition of Michael O'Shea at 56. Michael O'Shea was incredulous that his brother could not be admitted that evening. Michael also told Dr. Manzano of his concern for his brother's welfare and ex-

plained to Dr. Manzano that if John were not admitted that evening, John would not want to return the following day. Despite Michael's voiced concern and the mutual recognition that John should be admitted, Dr. Manzano said "What can I do?" *Id.*

In an affidavit, Dr. Manzano stated that the lack of available space that evening in the Northport psychiatric wards was not determinative of whether John would be admitted because "In such cases I directed that the nursing staff make a bed available in another ward or area so that dangerous patients could be safely kept overnight and then be transferred to the psychiatric wards the following day after morning discharges created open beds." Affidavit of Dr. Manzano, ¶ 18. Dr. Manzano also stated that "Had I believed that John O'Shea was dangerous to himself or to others on the night of August 5, 1980, I would have admitted him to the hospital notwithstanding the unavailability of open beds in the psychiatric wards." *Id.* In Dr. Manzano's opinion, John O'Shea posed no danger to himself and others on the night of August 5. Dr. Manzano was confident that John would be safe at home that evening, that he would take his medication, and that the family would return John to Northport the next morning.

Despite Dr. Manzano's confidence, John did not return to Northport for admission the next day, nor did he appear there on August 7. Although William tried to take John to Northport on August 6, he refused to go and no one from the O'Shea family contacted Northport concerning John's refusal. William has since testified that John made no threats to any of the family members and he exhibited no violent tendencies. Deposition of William O'Shea, at 39–40. The situation was unchanged the following day, August 7. John was not violent, made no threats and, in addition, no one tried to take John to Northport. No one called Northport or the police and apparently no effort was made by either William or Marion to have John admitted at Northport that day. *Id.* at 43–44. Unfortunately, John O'Shea's relationship with his parents came to a violent and tragic conclusion the fol-

lowing day, August 8, when John murdered his mother with a hammer and assaulted his father when he came to her rescue.

## DISCUSSION

Under the Federal Tort Claims Act, the district courts have exclusive jurisdiction

> on claims against the United States, for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government ... under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Accordingly, this Court must look to the law of New York to determine the extent of liability. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

In New York, it is a well-established rule that there is no liability for an erroneous professional judgment. *Pike v. Honsinger,* 155 N.Y. 201, 49 N.E. 760 (1898); *Cummings v. Fondak,* 122 Misc.2d 913, 474 N.Y.S.2d 356 (App.Term 1st Dep't 1983) (per curiam). In establishing the standard for professional malpractice, the New York Court of Appeals has held that "The law holds him liable for an injury to this patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." 155 N.Y. 209, 49 N.E. 760. The Court of Appeals further stated that "The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after a careful examination." *Id.* This standard has guided New York courts through all phases of professional malpractice, including psychiatry. *Bell v. New York City Health & Hospitals Corp.,* 90 A.D.2d 270, 456 N.Y.S.2d 787, 793 (2d Dep't 1982) (citations omitted). Lawsuits for psychiatric malpractice in New York courts often involve the physician's decision to release someone who had been confined for

treatment, and New York courts will not impose liability when they find that the psychiatrist made a professional medical judgment. *See Bell v. New York City Health & Hospitals Corp., supra; Fiederlein v. City of New York Health & Hospitals Corp.,* 80 A.D.2d 821, 437 N.Y.S.2d 321 (1st Dep't 1981); *Paradies v. Benedictine Hospital,* 77 A.D.2d 757, 431 N.Y.S.2d 175 (3d Dep't 1980); *Centeno v. City of New York,* 48 A.D.2d 812, 369 N.Y.S.2d 710 (2d Dep't 1975), *aff'd* 40 N.Y.2d 932, 389 N.Y.S.2d 837, 358 N.E.2d 520 (1976); *Cameron v. State of New York,* 37 A.D.2d 46, 322 N.Y.S.2d 562 (4th Dep't 1971); *Higgins v. State,* 24 A.D.2d 147, 265 N.Y.S.2d 254 (4th Dep't 1965); *Seavey v. State,* 21 A.D.2d 445, 250 N.Y.S.2d 877 (4th Dep't 1964); *Taig v. State of New York,* 19 A.D.2d 182, 241 N.Y.S.2d 495 (3d Dep't 1963); *St. George v. State of New York,* 283 A.D. 245; 127 N.Y.S.2d 147 (3d Dep't 1954); *Statini v. State of New York,* 202 Misc. 689, 112 N.Y.S.2d 20 (Ct.Cl.1952).

▮ Building on the rule first laid down in *Pike,* New York courts recognize that a number of policies also affect the state's decision to release a psychiatric patient, namely, the safety of both the patient and the public at large as well as the liberty of the confined patient. In *Statini v. State,* 202 Misc. 689, 112 N.Y.S.2d 20, 23–24 (Ct. Cl.1952), a case similar to the one before this Court, the New York Court of Claims recognized the value of the state's convalescent status program, which "aims to take the patient out of the hospital which is a place of care as distinguished from a place of confinement, and move him into a normal environment in aid of his social adjustment." 112 N.Y.S.2d at 23. New York has sought to return the patient to society and in *St. George v. State,* 283 A.D. 245, 127 N.Y.S.2d 147 (3d Dep't 1954), the Appellate Division recognized that imposing liability upon the state for a released patient's tortious conduct "would mean that the state could release no one from any state mental institution without being under the risk of liability for whatever he did thereafter, and the result would necessarily be reluctance to release and the un-

necessary confinement of persons who would benefit by release." 283 A.D. at 249, 127 N.Y.S.2d at 151. In *Taig v. State,* 19 A.D.2d 182, 183, 241 N.Y.S.2d 495, 496–97 (3d Dep't 1963), the Court sought to balance the state's policy of rehabilitating psychiatric patients through convalescent out-patient programs against the risk to public safety. There the court concluded that the risk was acceptable "even though it may sometimes result in injury to the patient or others." *Id. See also Higgins v. State of New York,* 24 A.D.2d 147, 265 N.Y.S.2d 254 (4th Dep't 1965) (citing *Excelsior Insurance Company v. State of New York,* 296 N.Y. 40, 46, 69 N.E.2d 553, 556 (1946)). Although the instant case does not involve a decision to release but only a failure to re-admit, New York jurisprudence makes it clear that the professional medical judgment immunity extends to out-patient cases and other facets of the admissions decision. Furthermore, though the United States is not bound by New York's policy of rehabilitation through release, the United States has consented to suit under the law of the place where the tort occurred and there has been no showing that Northport and Lynbrook's out-patient treatment policies and admissions decisions differ from those employed by New York.

▮ Despite criticism of the professional medical judgment immunity, *Topel v. Long Island Jewish Medical Center,* 55 N.Y.2d 682, 685–97, 446 N.Y.S.2d 932, 934–41, 431 N.E.2d 293 (1981) (Fuchsberg, J., dissenting), it remains the law of New York. *cf. Huntley v. State of New York,* 62 N.Y.2d 134, 476 N.Y.S.2d 99, 464 N.E.2d 467 (1984) (per curiam) (hospital liable for suicide of patient when professional medical judgment was not exercised). Although the New York Court of Appeals has stated that "the line between medical judgment and deviation from good medical is not easy to draw," *Topel v. Long Island Jewish Medical Center,* 55 N.Y.2d 682, 684, 446 N.Y.S.2d 932, 934, 431 N.E.2d 293 (1981) (memorandum), there must be "something more" than an error in judgment. *See Homere v.*

*Stillman,* 48 A.D.2d 422, 370 N.Y.S.2d 246 (3d Dep't 1975); *See also Cohen v. State of New York,* 51 A.D.2d 494, 382 N.Y.S.2d 128 (3d Dep't 1976) ·(failure to keep detailed medical notes was more than an error in judgment); *Clarke v. State of New York,* 99 A.D.2d 616, 972 N.Y.S.2d 170 (3d Dep't 1984) (no professional medical judgment immunity when physician was aware of patient's drug abuse, assaultive and bizarre behavior, prior suicide attempts, and deteriorating condition); *Bell v. New York City Health & Hospitals Corp.,* 90 A.D.2d 270, 456 N.Y.S.2d 787 (2d Dep't 1982) (no professional medical judgment because physician failed to make a careful examination); *cf. St. George v. State of New York,* 127 N.Y.S.2d at 150–51 ("it would place an unreasonable and unfair burden upon the state if it were to be held responsible in damages for everything that a person does after he has been discharged or released from one of its state institutions, even though the release was through an error of judgment, unless there is something more present...."). The immunity will protect the state from liability, even in the presence of an erroneous decision, when there has been a careful examination of the patient's condition. *Cameron v. State of New York,* 37 A.D.2d 46, 322 N.Y.S.2d 562 (4th Dep't 1971).

Therefore, the issue in this case is whether Dr. Manzano made a professional medical judgment when he decided not to admit John O'Shea to Northport on the evening of August 5, 1980 because he failed to make a careful examination. After a thorough examination of the record, the Court concludes that Dr. Manzano made a professional medical judgment and therefore the United States is entitled to summary judgment.

▇ On the record before the Court, it is clear that Dr. Manzano made a careful examination of John O'Shea's condition before deciding to defer admission until the following day. On the evening of August 5, no significant element of John's medical record and condition was overlooked by Dr. Manzano. He had access to and consulted John's entire Northport file. In addition, Dr. Manzano had a history compiled that evening by a Northport nurse and Dr. Armintano's note from Samaritan Hospital. Dr. Manzano also examined John for half an hour that evening. In short, Dr. Manzano had available to him and considered all the sources of information that would reveal whether John was an emergency case. This case is therefore unlike either *Bell v. New York City Health & Hospitals Corp., supra,* where the psychiatrist failed to examine all of the relevant information before deciding to release a patient or *Clarke* where the state failed to keep complete records.

In addition, the record before Dr. Manzano did not reveal a psychiatric patient requiring immediate hospitalization. Aside from the incidents that led to John's hospitalization in 1978, there was no history of violence, threats, or aggressive behavior. This includes John's entire time as an outpatient at Lynbrook. During his interview with John, Dr. Manzano elicited no homicidal or suicidal impulses, threats, or an inclination towards violence. Finally, this is not a case where a psychiatrist must hazard a guess about the violent potential of a soon to be released psychiatric patient because John had already been an out-patient for over a year before he sought voluntary admission at Northport on August 5.

Plaintiffs contend that Dr. Manzano was wrong when he failed to admit John that evening and that the evidence points to a paranoid schizophrenic whose condition was deteriorating rapidly. It may have been wrong to defer John's admission to the following day. But the law requires that there must be "something more" than an erroneous judgment before a defendant will be liable. In this case, that "something more" is not present. Despite John's apparent deterioration, there was no indication, either in John's past or present condition as an out-patient, that John would become violent and homicidal. Furthermore, Dr. Manzano was fully aware of John's medical history and prognosis on the

evening of August 5 when he denied admission.

The Court is acutely aware of the enormous tragedy that has been visited upon the O'Shea family. Nevertheless, after drawing all factual inferences favorably to plaintiff, *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), the Court cannot discern any material issues of fact that preclude the conclusion that Dr. Manzano made a professional medical judgment when he decided not to admit John to Northport on August 5, 1980. Fed.R.Civ. 56(c).

Accordingly, defendant's motion for summary judgment is granted and the complaint is dismissed. The Clerk of the Court is directed to enter judgment for the United States.

SO ORDERED.